710 P.2d 526

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Albert Ray BEAM, Defendant-Appellant.**

No. 15453.

Supreme Court of Idaho.

Oct. 24, 1985.

Rehearing Denied Dec. 31, 1985.

Van G. Bishop, Nampa, for defendant-appellant.

Jim Jones, Atty. Gen., and Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

SHEPARD, Justice.

This is an appeal from appellant Beam's conviction of first degree murder and rape and the sentences imposed thereon. The district court sentenced Beam to death for first degree murder and to a fixed period of 30 years for rape. We review in response to the appeal as well as pursuant to the automatic review of death penalty sentences provisions of I.C. § 19–2827. We hold that no reversible error was committed, we affirm the convictions, and find that the sentence of death was validly imposed.

On July 8, 1983, the body of the victim of this crime, a thirteen-year-old girl, was found in the water of a drainage canal in Nampa, Idaho. She had been sexually abused and raped and her death was due to either drowning or a knife wound to her throat. The following day, a criminal complaint was filed charging appellant Beam with first degree murder. He was arrested in Nevada and gave a confession to law enforcement officials that inculpated Michael Shawn Scroggins. On July 11, a criminal complaint was filed charging both Beam and Scroggins with first degree murder, rape, and the use of a deadly weapon in the commission of a crime.

The record reveals the following facts, much of them coming from the testimony of appellant Beam. On July 7, 1983, the victim and a friend were on their way home when they encountered Beam and Scroggins. Beam and Scroggins allegedly wanted to get a telephone number and the four agreed to go to the victim's home for that purpose. Both parents of the victim were at work at that time. Once inside, the four watched television, following which Beam and Scroggins asked the girls if they wanted to go on a walk and offered them marijuana. The men stated that only one of the girls could go with them at a time. The victim agreed to go and left with Beam and Scroggins.

Beam testified to the following account of the crime.[1] The three of them walked to a back yard and stopped near a tree. Scroggins had a pair of handcuffs, which he used to manacle the victim and then had oral, vaginal and anal sex with her. Beam then had sexual intercourse with the victim. The handcuffs were removed so she could dress and then replaced on her wrists. Beam and Scroggins then walked the victim toward a drainage ditch, during which time Scroggins twice told the victim they were going to kill her. The victim pleaded with them to let her go and then fell into the stream. Scroggins shoved her head under the water, then pulled her out and slit her throat. Beam then held her head under water until she stopped moving. Her body was left in the stream.

At the August 1983 arraignment and thereafter, Beam and Scroggins were each represented by separate counsel. The possible necessity for severance of the defendants' trials was discussed at the arraignment because of the existence of the confession by Beam and certain incriminating statements made by Scroggins. The State made a motion to empanel two juries to hear the case simultaneously because of the Beam confession which inculpated Scroggins and the rule in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), that a defendant's confession may not be used by a jury in deciding the guilt or innocence of a co-defendant.

Ultimately, the trial court ruled in favor of the State's motion to empanel two juries, holding that the cases would be severed on issues which were not relevant to both defendants, but that the cases would be jointly tried, with both juries sitting as to all other issues. The trial court reserved the right to determine which testimony would be presented to each jury.

Two juries were empaneled and sat simultaneously. Jury A heard the case against Beam and Jury B heard the case

---

1. The jury for Scroggins clearly did not believe Beam's testimony, as it found Scroggins guilty of attempted rape and acquitted him of the enhancement charge of using a knife in the commission of the crime.

against Scroggins. When counsel for Beam was engaged in cross-examination, Jury B was dismissed, and when counsel for Scroggins was cross-examining, Jury A was dismissed. When testimony probative as to Beam but prejudicial to Scroggins was about to be admitted, Scroggins' Jury B was to be excused from the courtroom, and vice versa. Most of the testimony pertained to both defendants and was not objectionable as to either one and was therefore heard by both juries. Separate opening and closing arguments were given before each jury.

The State's evidence at trial was not substantially controverted and established that the victim's wrists were bruised and that there was a knife wound to her right side where one of the defendants had cut her in slicing off her underwear. A pathologist testified as to evidence of semen in her vagina and rectum. Blood was found in the crotch area of her pants, which the testimony indicated was consistent with a traumatic injury to the vagina, inflicted while she was alive. The knife wounds to the victim's throat consisted of three or four slashes and were about four inches wide and almost an inch deep. The testimony indicated that the throat wounds were inflicted while the victim was alive, but that death was caused by drowning.

The Beam jury found Beam guilty of premeditated first degree murder and rape. The Scroggins jury found Scroggins guilty of first degree murder, finding that he did not commit the crime directly but rather aided and abetted and/or encouraged and advised its commission, and found Scroggins guilty of attempted rape. Both juries acquitted their respective defendant of the enhancement charge of using a deadly weapon (the knife) in the commission of a crime.

At Beam's sentencing hearing, testimony was offered by the State and the defense, the State calling three witnesses, the director of the Canyon County Detention Center (where Beam was incarcerated), a detention center sergeant, and one of Beam's prior cellmates. The defense called Beam. The trial court also had before it the presentence investigation and psycho-

logical evaluation reports. That testimony indicated that Beam abused drugs, was on parole for burglary when the murder was committed, had been exposed to and participated in much sexually deviant behavior, had tortured animals, was impulsive, and lacked any adequate conscience.

Following Beam's sentencing hearing, the trial court, pursuant to I.C. § 19–2515, found the existence of three statutory aggravating circumstances: (1) that the murder was especially heinous, atrocious and cruel and it manifested exceptional depravity; (2) that Beam had exhibited utter disregard for human life; and (3) that Beam, by prior conduct or conduct in the commission of the murder, had exhibited a propensity to commit murder which would probably constitute a continuing threat to society. The trial court considered six possible mitigating factors: that Beam was 21 years old; that he had been mentally and emotionally deprived; that he had been cooperative with police and had admitted involvement in the crime; that he had limited employment skills as a cook and a mechanic; that he suffered from substance dependency; and that he was raised in a turbulent family setting. The trial court found that these factors did not outweigh the gravity of the aggravating circumstances.

The trial court sentenced Beam to death for the murder and sentenced him to a concurrent determinate sentence of 30 years for the rape in the event that the death penalty was not upheld. Scroggins was sentenced to death for the murder and received a ten-year concurrent determinate sentence for attempted rape. The Scroggins' appeal is pending before this Court.

Beam asserts the following errors: (1) that the Idaho death penalty scheme is unconstitutional; (2) that the trial court erred in admitting into evidence certain photographs of the victim's body; (3) that I.C. § 18–207, which provides that mental condition shall not be a defense to any charge of criminal conduct, is a denial of due process; and (4) that the use of dual juries in a simultaneous trial of the co-defendants deprived Beam of due process.

■ Beam asserts the imposition of the death sentence in this case is violative of the Idaho Constitution because it was imposed by a judge rather than a jury. This Court has held that neither the United States Constitution, nor ID.CONST. art. 1, § 7, requires the participation of a jury in the sentencing process in a capital case. *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984). *See also Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).

Although Beam also argues that Idaho's statutory procedure in capital cases is unconstitutional because uneven imposition of the death penalty occurs based on the age of the defendant and the age and sex of the victim, we find those arguments to be without merit. Idaho's statutorily mandated sentencing in death penalty cases was enacted to give the trial judge specific and detailed guidance in deciding whether to impose the death penalty and thereby avoid an arbitrary or capricious imposition of the penalty. *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). Section 19–2515, Idaho Code, requires a sentencing hearing at which all relevant information is to be presented. The statute lists the aggravating circumstances, one of which must be found to exist beyond a reasonable doubt by the trial court. The aggravating circumstances must be held to outweigh any mitigating circumstances.

■ The age of a victim is a legitimate consideration in viewing the aggravating circumstances listed at I.C. § 19–2515(g)(5), (6), which provide in pertinent part:

"(5) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

"(6) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life."

■ The age of a defendant is likewise a legitimate consideration in the evaluative process as a mitigating factor. Further, this Court has held that the legislature's failure to list any mitigating factors in the capital sentencing scheme indicates its intent that the sentencing judge entertain the broadest view possible in considering any and all matters appropriate to a determination of imposition of the death penalty. *State of Idaho v. Caudill*, 109 Idaho 222, 706 P.2d 456 (1985).

■ Beam provides no basis for his suggestion that the death penalty is imposed arbitrarily in Idaho based on the sex of the victim. Presumably, he argues that the death penalty is imposed more freely when the victim is a woman, but we find no basis for that argument in view of the imposition of the death penalty in recent cases in which the victim was a man. *See State of Idaho v. McKinney*, 107 Idaho 180, 687 P.2d 570 (1984); *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), and also those recent cases in which the victim was a woman: *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983); *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981).

■ Beam asserts that the trial court erred in admitting four photographs of the victim taken at the time of autopsy. They included one long-range photograph of the throat wound and three close-up photographs, two showing either side of the wound and one focusing on the knife marks. Those photographs were introduced during the testimony of the pathologist, Dr. Donndelinger. Objections on the basis that they were highly prejudicial and also cumulative were overruled. Beam argues that the photographs were not necessary to illustrate Dr. Donndelinger's testimony and served merely to inflame the passion of the jury. The trial court has the discretion to admit into evidence photographs of the victim in a homicide case as an aid to the jury in arriving at a fair understanding of the evidence, as proof of the *corpus delecti*, the extent of the injury, the condition of the body, and for their bearing on the question of the degree and

atrociousness of the crime. The fact that the photographs depict the actual body of the victim and the wounds inflicted on her and may tend to excite the emotions of the jury is not a basis for excluding them. *State v. Caudill,* 109 Idaho 222, 706 P.2d 456 (1985); *State v. Bean,* 109 Idaho 231, 706 P.2d 1342 (1985).

■ A defendant cannot complain that a jury was inflamed or that the jury's emotions were excited by evidence which depicts for the jury accurately that a crime was committed and the method, fashion and atrociousness by which the crime was committed. Beam, like Scroggins, was charged with the enhancement crime of using a knife in the commission of this crime. The fact that Beam asserts that Scroggins cut the victim's throat does not prevent the State from presenting a full and accurate account of the circumstances surrounding the commission of the crime to the Beam jury. *State v. Izatt,* 96 Idaho 667, 534 P.2d 1107 (1975).

■ Beam next argues that he was denied due process by the operation of I.C. § 18–207, which provides at subsection (a) that "[m]ental condition shall not be a defense to any charge of criminal conduct." [2] Beam argues first that I.C. § 18–207 conflicts with §§ 18–114 and 18–115, which require a showing of intent during the commission of a crime. Section 18–114, Idaho Code, requires that "In every crime or public offense there must exist a union, or joint operation, of act or intent, or criminal negligence." Section 18–115, Idaho Code defines "intent" as an element that is "manifested

by the circumstances connected with the offense, and the sound mind and discretion of the accused."

Beam does not specify any instance in which evidence relating to his mental condition was offered and excluded by the trial court. Section 18–207, Idaho Code, does not prevent a defendant from presenting relevant evidence of his mental state. We hold that the three statutes are not in conflict since I.C. §§ 18–114 and 18–115 do not mandate the existence of a defense based upon insanity, but rather I.C. § 18–207 reduces the question of mental condition from the status of a formal defense to that of an evidentiary question. Section 18–207(c), Idaho Code, continues to recognize the basic common law premise that only responsible defendants may be convicted.

■ It is Beam's second argument that I.C. § 18–207 violates the doctrine established by *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which held that due process of law requires that the prosecution prove every fact necessary to constitute the crime charged beyond a reasonable doubt. It is asserted that I.C. § 18–207 impermissibly relieves the State of that burden, since it operates as a presumption that no defendant can possess such lack of mental capacity as to be unable to formulate the criminal intent. We disagree. I.C. § 18–207(c) specifically provides that a defendant is not prohibited from presenting evidence of mental disease or defect which would negate intent.

Beam finally asserts he was denied due process by the refusal of the trial court to sever the two cases and the trial court's substitution of a two-jury, simultaneous tri-

---

2. **"18–207. Mental condition not a defense— Provision for treatment during incarceration— Reception of evidence.**—(a) Mental condition shall not be a defense to any charge of criminal conduct.

(b) If by the provisions of section 19–2523, Idaho Code, the court finds that one convicted of crime suffers from any mental condition requiring treatment, such person shall be committed to the board of correction or such city or county official as provided by law for placement in an appropriate facility for treatment, having regard for such conditions of security as the case may require. In the event a sentence

of incarceration has been imposed, the defendant shall receive treatment in a facility which provides for incarceration or less restrictive confinement. In the event that a course of treatment thus commenced shall be concluded prior to the expiration of the sentence imposed, the offender shall remain liable for the remainder of such sentence, but shall have credit for time incarcerated for treatment.

(c) Nothing herein is intended to prevent the admission of expert evidence on the issues of mens rea or any state of mind which is an element of the offense, subject to the rules of evidence."

al. This is the first case to come before this Court in which such a procedure has been utilized, although other courts have reviewed the process. Therefore, we have carefully reviewed the record to ensure that Beam received a fair trial. We find no reversible error.

■ The dual jury procedure was employed by the trial court here to avoid prejudice to the two defendants, for reasons of judicial economy, and to avoid the problem of the rule in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The mere fact that a two-jury procedure was adopted to avoid the impact of *Bruton* does not defeat its use. *United States v. Sidman,* 470 F.2d 1158 (9th Cir.1972), *cert. denied,* 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973).

While no courts appear to have given a dual jury procedure a blanket endorsement, none of them have held that the procedure was a constitutional violation. *See Smith v. DeRobertis,* 758 F.2d 1151 (7th Cir.1985) (attempted murder); *United States v. Lewis,* 716 F.2d 16 (D.C.Cir.1983), *cert. denied* 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686 (1984) (conspiring to commit bribery and soliciting bribery); *United States v. Hayes,* 676 F.2d 1359 (11th Cir.1982), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed.2d 608 (1983) (conspiracy to import and to possess with intent to distribute marijuana); *United States v. Rimar,* 558 F.2d 1271 (6th Cir.1977), *cert. denied sub nom. Rimar v. United States,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978) (stealing and aiding and abetting in theft of goods from interstate commerce); *United States v. Rowan,* 518 F.2d 685 (6th Cir.1975), *cert. denied sub nom. Jackson v. United States,* 423 U.S. 949, 96 S.Ct. 368, 46 L.Ed.2d 284 (1975) (bank robbery); *United States v. Sidman, supra* (bank robbery); *State of Arizona v. Lambright,* 138 Ariz. 63, 673 P.2d 1 (1983) (murder); *People v. Williams,* 93 Ill.2d 309, 67 Ill.Dec. 97, 444 N.E.2d 136 (1982) (murder); *State of New Jersey v. Corsi,* 86 N.J. 172, 430 A.2d 210 (1981) (murder); *People v. Church,* 102 Ill. App.3d 155, 57 Ill.Dec. 679, 429 N.E.2d 577 (1981), *disapproved on other grounds,* 113 Ill.App.3d 305, 69 Ill.Dec. 339, 447 N.E.2d 556 (1983).

As noted in *Lambright,* 673 P.2d at 7, the authorities to date, including those cases which disapprove of future use of the multiple jury procedure, are unanimous in refusing to reverse a conviction merely based on the use of this procedure, without some specific showing of prejudice. Here we find no indication of prejudice to the appellant Beam.

■ Beam argues that prejudice resulted to him through the admission of the testimony of the State's witness, Sandra Wahlen, Beam's fiance. We disagree. Wahlen testified before both juries that Beam came over to her apartment after the murder had taken place. She was asked to "tell the juries what Ray [Beam] told you that evening." Jury B (Scroggins jury) was excused from the courtroom and Wahlen then testified that Beam had told her, "I think I killed someone." Jury A (Beam jury) was then excused and counsel for Scroggins moved that the Scroggins jury should be allowed to hear this statement, which counsel considered exculpatory as to Scroggins. Counsel for the State pointed out that her earlier statement had been that Beam had said, "I think *we* killed someone," (emphasis added), and that Wahlen should have an opportunity to correct her testimony. The next day Wahlen was recalled to the stand to testify in front of both juries, where she explained the inaccuracy of her first response and stated that what Beam had actually said was, "I think we killed someone."

Beam argues that this episode resulted in the juries witnessing both defense counsel attacking each other's client. We disagree and hold that Beam has not established any prejudice or jury confusion in this record. Beam was incriminated as much by the witness's second version of the witness's testimony as he was by her first version. The apparent contradiction in Wahlen's testimony could only have operated to Beam's benefit if her testimony appeared contradictory and inaccurate.

Beam argues that the dual jury procedure should not have been used because of the antagonistic defenses of Beam and Scroggins. We disagree. If Scroggins and Beam had been tried jointly before one jury, the problem of antagonistic defenses might have been very real. The record here does not reflect any antagonistic defense problem as to Beam. Scroggins did not testify. The only testimony heard by Jury A (Beam jury) as to the acts of rape and murder came from Beam alone. Beam admitted having sex with the victim and drowning her. Jury A heard nothing to contradict Beam's story that Scroggins handcuffed the victim, initiated the sex acts and slit the victim's throat.

A motion for severance of trial of multiple defendants is addressed to the discretion of the trial court. I.C.R. 14. While our rules do not explicitly provide for a dual jury procedure, neither do they expressly prohibit it. A trial court may provide whatever relief from prejudicial joinder that justice requires. I.C.R. 14.

The use of a dual jury procedure in trying two co-defendants for murder was utilized in *People v. Church*, 102 Ill.App.3d 155, 57 Ill.Dec. 679, 429 N.E.2d 577 (1981), where the court stated:

"Moreover, where a defendant is given every opportunity to present a complete defense before one jury, cannot point to any event which confused the jury or affected its ability to render a decision fairly, and the record shows that the trial judge adequately prepared the jurors for the procedure, the two-jury trial is acceptable." *Id.* 57 Ill.Dec. at 686, 429 N.E.2d at 584. (Citations omitted.)

■ The record before us reveals that the trial judge carefully described and explained the procedure which would be used at trial to all of the prospective jurors. After the juries were empaneled, Jury A was advised that it would determine the guilt or innocence of Beam, and Jury B was advised that it would determine the guilt or innocence of Scroggins. The members of the two juries were required to avoid all contact with members of the other panel.

A bailiff was assigned to each jury. At the end of the first day of trial, both juries were sequestered at a nearby hotel in such a manner that Jury A was segregated from Jury B. The record indicates that the trial court proceeded with extreme caution throughout the trial and we find no abuse of discretion.

■ It is argued that this case was an experiment with the dual jury system, which should not have been used in a potential death penalty case. As noted in *Sidman*, 470 F.2d at 1168, "fair new procedures, which tend to facilitate proper fact finding, are allowable, although not traditional." *See also United States v. Lewis*, 716 F.2d 16 (D.C.Cir.1983), *cert. denied sub nom. Motlagh v. United States*, 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686 (1983). While other courts have used the dual jury procedure in murder cases, the death penalty has been given and affirmed in only two such cases. *People v. Williams*, 93 Ill.2d 309, 67 Ill.Dec. 97, 444 N.E.2d 136 (1982), and *State v. Lambright*, 138 Ariz. 63, 673 P.2d 1 (1983). In *Lambright*, the Court, although affirming the imposition of the death penalty, indicated its belief that death penalty cases are inappropriate vehicles for the procedure and that the practice should be avoided in the future. We do not necessarily agree with the *Lambright* Court. We uphold the use of two juries in the instant case, but like many other courts, our decision is not to be taken as a blanket endorsement. We are not concerned with the fact that the procedure is relatively new to criminal procedure across the country. After all, the procedure is largely designed to protect the constitutional rights of co-defendants under the strictures of decisions of the United States Supreme Court, such as *Bruton, supra*.

■ On the other hand, judicial economy, in and of itself, provides no basis for the wholesale use of such procedure. We emphasize that the primary consideration is to be the protection of the constitutional rights of the defendants. Those constitutional rights may well be impacted when

two separate trials are held with the second defendant laboring under the burden of extensive publicity generated by the first trial. In such a situation, selection of unbiased jurors in some of our smaller populated counties may be difficult, if not impossible. In appropriate cases in the future, total severance of trials for co-defendants will continue to be necessary and desirable. In other appropriate cases, dual jury procedures may well take place.

In this case, the trial judge was cautious and meticulous in his conduct of the trial before the dual juries and we see no indication whatsoever that the procedure resulted in unfairness to Beam, in any prejudice to Beam, or any violation of Beam's constitutional rights. The decision to utilize a dual jury procedure must be carefully made with the realization of the potential for error. Here, however, we find no error.

■ As mandated by I.C. § 19–2827(c)(3), we have reviewed the proportionality of the sentence of death imposed here to determine whether it is excessive or disproportionate to the penalty imposed in similar cases, including those collected in *State v. Stuart*, Idaho, (Sup.Ct. No. 14865, May 3, 1985), and in addition have considered the recent cases of *State v. Bean*, 109 Idaho 231, 706 P.2d 1342 (1985); and *State v. Caudill*, 109 Idaho 222, 706 P.2d 456 (1985); *State v. McKinney*, 107 Idaho 180, 687 P.2d 570 (1984); *State v. Aragon*, 107 Idaho 358, 690 P.2d 293 (1984). We hold that the sentence of death imposed in the instant case is not excessive or disproportionate to the penalty imposed in similar cases. The record indicates that the instant crime was an extremely violent, atrocious and heinous offense, carried out with excessive cruelty.

■ Appellant Beam received a fair trial and his guilt was established beyond a reasonable doubt. We find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any arbitrary factor. In the sentencing process, the trial court correctly determined the aggravating and mitigating circumstances and found that the mitigating circumstances did not outweigh the gravity of the aggravating circumstances. He correctly imposed the death sentence upon the appellant.

The judgments of convictions and the sentences imposed thereon are affirmed.

DONALDSON, C.J., and BAKES, J., concur.

HUNTLEY, J., concurs in result.

BISTLINE, Justice, dissenting.

As Justice Shepard points out in his opinion, which is now the opinion for the Court, Beam and Scroggins were jointly charged and jointly tried at one trial, before one judge presiding over two juries. This procedure, entirely without precedent in Idaho and not encompassed in the Court's Idaho Rules of Criminal Procedure, is by the majority said to be justified by "reasons of judicial economy," and to avoid the problem of the rule in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The *Bruton* rule has been in effect for almost twenty years. I do not question its validity in the least. But when the reason for the rule does not exist, the rule has no application.

Behind the *Bruton* rule is "the right of cross-examination secured by the confrontation clause." *Bruton, id.* at 128, 88 S.Ct. at 1623; *Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965). Bruton's co-defendant was Evans. "Plainly, the introduction of Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand. Petitioner was thus denied his constitutional right of confrontation." *Bruton, supra*, 391 U.S. at 128, 88 S.Ct. at 1623. In those cases where the confessant does take the stand, the Court said this: "Not only are the incriminations devastating to the defendant, *but their credibility is inevitably suspect*, a fact recognized when accomplice do take the stand and the jury is instructed

to weigh their testimony carefully given the recognized motivation to shift blame onto others." *Id.* at 136, 88 S.Ct. at 1628 (emphasis added).

The trial strategy of each of the two co-defendants in the case we review was to establish himself as but *the accomplice,* and that the other was the actual trigger man. That motivation is obvious; it need not be further addressed. Even Justices White and Harlan in dissent were agreed that as to a confession of a co-defendant: "As to him it was inadmissible hearsay, a presumptively unreliable out-of-court statement of a non-party who was not a witness subject to cross-examination." Here neither Beam nor Scroggins was a non-party, but were both the defendants on trial, and both testified during the course of the trial —each, while implicating himself, pointed the finger of primary guilt at the other; hence, the testimony of each should have been "tested by cross-examination." *Id.* *Cf.* 5 Wigmore, *Evidence* § 1362, at 3. That cross-examination should not have been just cross-examination by the prosecutor, but by counsel for the co-defendant— which counsel was present, with his client, *throughout the entire joint trial.* The trial court, however, having succumbed to the prosecutor's pre-trial motion that at the joint trial there should be a "Beam jury" and a "Scroggin jury" did not allow what would without doubt be the most telling cross-examination. Only by such cross-examination by counsel representing the defendants who had the most at stake could "the search or pursuit for truth be served." *Id.* at 133, 88 S.Ct. at 1626.

Had this crime been committed and the ensuing trial taken place prior to *Bruton,* the two co-defendants, Beam and Scroggins, would have been jointly charged, as they were here, and would have been cross-examined not only by the prosecutor, but by counsel for the obviously antagonistic adversely-positioned co-defendant. It cannot be contended otherwise.

It is in order at this point to closely view the trial proceedings with regard to the state calling Beam to the stand as a state's witness—which can only be done by providing verbatim excerpts, but first prefaced by the cautioning remarks of Canyon County deputy prosecutor, Lansing Haynes: [1]

"MR. JONES: Your Honor, unfortunately at this time the State has to ask for a brief recess.

"COURT: There is going to be another short recess, ladies and gentlemen, because of a witness problem here. We will bring you back into the courtroom as soon as possible.

(Whereupon, a brief recess was taken. Reconvened. Counsel for respective parties, together with the Defendants, present. The following proceedings were had in the absence of both Jury A and Jury B.)

"COURT: Mr. Haynes?

"MR. HAYNES: Your Honor, before we call the next witness, I understand with the two-jury system we are feeling our way through this, and I would request that all Counsel, State, and especially Mr. White, reduce side bar comments on the evidence, whether the State is stopping its case or starting its case. *We all know we are trying to feel our way through, and this is getting into a dangerous area.*

"COURT: Comments of Counsel, of course, at any time and in any case should be very carefully guarded so there is no impropriety. Remember you are officers of the Court. State's next witness?

"MR. JONES: The State calls Ray Beam to the stand.

ALBERT RAY BEAM,

after first having been duly and regularly sworn to testify, testified on behalf of the State as follows:

"COURT: Is the State offering Mr. Beam as to both Jury A and Jury B?

"MR. JONES: That's correct, Your Honor.

. . . .

---

1. It was Mr. Haynes who had moved the Court   into utilizing two juries at the joint trial.

DIRECT EXAMINATION
QUESTIONS BY MR. JONES:

"Q   Would you state your name, please?

"A   Albert Ray Beam.

"Q   Please spell your last name, Mr. Beam.

"A   B-e-a-m.

"Q   Mr. Beam, are you testifying here voluntarily today?

"A   Yes.

"Q   Have any deals or agreements been offered to you by the Prosecuting Attorney's Office?

"A   No.

"Q   Where did you live on July 7, 1983?

"A   Excuse me?

"Q   Where did you live on July 7, 1983?

"A   1023 South Ivy, Apartment 36.

"Q   Who did you live with?

"A   Sandy Wahlen.

"Q   Do you recall that date?

"A   Yes.

"Q   Do you recall, on that day, approximately what time you would have eaten supper?

"A   Yes.

"Q   What time was that?

"A   Between 7:30 and 8:00.

"Q   What did you do after eating supper?

"A   Watched TV for awhile; then Shawn and I left.

"Q   You said Shawn and you left. Are you referring to Shawn Scroggins seated to the left of myself and next to Kenneth White in a blue suit?

"A   Yes.

"MR. JONES: Your Honor, may the record reflect he has identified the Defendant Scroggins?

"COURT: The record may so show.

BY MR. JONES:

"Q   At the time you left with Mr. Scroggins until midnight, what did you do?

"A   At first we just went walking around.

"Q   Was Mr. Scroggins with you then?

"A   Yes, he was.

"Q   Do you know if Mr. Scroggins is right or left-handed?

"A   I think he's right-handed, sir.

"Q   Where were you and Mr. Scroggins at about midnight?

"A   Down by the Nampa Realty.

"Q   Could you tell the jury what, if anything, occurred at the Nampa Realty?

"A   We was walking, and we seen these two girls, Mondi and Donnette. And I didn't remember their names at that time, but we stopped by to talk to them.

"Q   Then what happened?

"A   Shawn was joking around. He put the handcuffs on him and Donnette, and then he was joking around with the knife. And he said, 'I'm going to slice your throat,' just joking around.

"Q   Who had the cuffs when you first got to the Nampa Realty?

"A   I did. He asked me for them.

"Q   When did he ask you for them?

"A   Just before we got by them.

"Q   You have seen a pair of handcuffs during this trial, have you not?

"A   Yes, I have.

"Q   Are these the same handcuffs?

"A   Yes.

"Q   When were those handcuffs taken off of Donnette?

"A   About two blocks before we got to her house.

"Q   How were they taken off?

"A   With the knife.

"Q   Who did that?

"A   I did.

"Q   How did you come to have a knife?

"A   Well, I handed Shawn the handcuffs and he pulled it out and was teasing with it. And he goes, 'Hang onto the knife, 'cause you're going to have to take these

off before we get to her house.' And I go, 'Okay.' So I put it in my pocket.

"Q  Where did that occur?

"A  At Nampa Realty.

"Q  Where did you go from Nampa Realty?

"A  To her house.

"Q  When you say 'her,' who are you referring to?

"A  Donnette and Mondi.

"Q  Do you recall whether or not you arrived at Mondi Lenten's home?

"A  Yes, we did.

"Q  Would you tell the jury, please, what occurred at Mondi Lenten's home?

"A  Well, after we got in, we sat down and was watching TV. And I think it was Donnette that shut off the TV and her brother was playing Pacman, and we all was watching him play Pacman at that time, about 35 to 40 minutes. Then we left.

"Q  Who—just before you left, who had the handcuffs and who had the knife?

"A  I had the handcuffs and he had the knife. After I took the handcuffs off of both of them, I give him the knife and he give me the handcuffs.

"Q  Did you leave Mondi Lenten's house?

"A  Yes.

"Q  Who left with you?

"A  Mandy.

"Q  Anybody else?

"A  Shawn and I.

"Q  Do you recall where the three of you went?

"A  Yes, I do.

"MR. JONES: I wonder if the Bailiff would be kind enough to put out State's Exhibit No. 2, please.

(Whereupon, the Bailiff produced State's Exhibit No. 2AB.)"

BY MR. JONES:

"Q  Mr. Beam, if you need to, there is a pointer to your left there. Could you point

out where you and Mandy Lenten and Mr. Scroggins stopped?

"A  Yes, right here underneath this walnut tree.

"Q  Is that a lawn area?

"A  Yes, it is.

"Q  Mr. Beam, would you tell us what occurred in that lawn area next to that walnut tree?

"A  Well, we was all three sitting and talking, and Shawn goes, you know, he goes, 'Do you want—' he asked her before, you know, if she wanted to get stoned and she said yes. So he goes, 'Beam, you got any weed?' And I go, 'No, man, I already smoked it.' And he goes, 'No, man, you got it.' And I go, 'No, I don't, Shawn, you have it if there is any.'

"So I looked in my wallet. I knew I didn't have any, but I looked anyway. And I go, 'No, I don't got it.' And he goes and looks in his wallet and he says, 'Well, I don't got any either.' Then he goes, 'Let me see the handcuffs.' And I go, 'Why?' And he goes, 'Just let me see the handcuffs.'

"So I threw them to him, and he put them on her at that time.

"Q  How did he handcuff her?

"A  In the front.

"Q  What happened after that?

"A  He unbuttoned her pants, unzipped them and pulled them down and started having sex with her.

"Q  Did you actually see Mr. Scroggins put his penis inside of Miss Lenten?

"A  Yes, I did.

"Q  What happened after that?

"A  After he was finished, he asked her to give him a blow job, and she said no. And then he goes, 'Well, if you don't,' you know, 'it's going to be bad on you.' And at that time he put his knife to her throat. And she goes, 'Okay,' and so she went ahead and proceeded in doing that.

"Q  How long did that blow job last?

"A   I'm not real sure, probably 10 or 15 minutes.

"Q   Now, you say Mr. Scroggins put a knife to Mandy Lenten's throat?

"A   Yes.

"Q   After that she consented to giving a blow job to Mr. Scroggins?

"A   Yes.

"Q   What happened after that?

"A   Well, when he got off, I had sex with her.  And before I did, I go, 'You know, I don't really want to do this—'

"Q   You're getting a little ahead of me here now.   Mr. Scroggins finished with what you referred to as a blow job.

"A   Oh, yes.

"Q   What else did Mr. Scroggins do at that time?

"A   He told her to turn over, that he wanted to do it in her butt.

"Q   What happened then?

"A   He started to put it in, and she pooped on him.  And he pulled it out.  And he cut her underwear off and wiped it off him.

"Q   At this time Mandy Lenten would have been on her stomach?

· "A   Yes.

"Q   Would you describe how the panties were cut off Mandy Lenten?

"A   With a knife on the side.   He grabbed hold of them and just sliced 'em off.

"Q   Did you observe Mr. Scroggins doing anything with Miss Lenten's breasts?

"A   Yes, he was sucking on her.

"Q   Now, would you tell the jury what you did, please?

"A   After he got finished and she turned back over, I had sex with her.  I go, 'I don't really want to do this.'  And she goes, 'I know.'  And I go, 'It is all right, isn't it?'  And she goes, 'Yeah.'  So I had sex with her.

"Q   Did you ejaculate inside of her?

"A   Yes, I did.

"Q   Was she handcuffed at that time?

"A   Yes, she was.

"Q   What happened after that?

"A   Shawn told her to get up, put her pants back on, and she did.  Then he unhandcuffed one hand and told her, 'Let's go down to the creek.'

"Q   Where was the knife at that time?

"A   In his hand.

"Q   Do you recall if Mr. Scroggins said anything else at approximately that time?

"A   Yeah.  She goes, 'What are you going to do?'  And he goes, 'We're going to kill you.'

"Q   And then what happened?

"A   And I go, 'Shawn, what the hell are you doing?'  And then he said it again, and she goes, 'No, please don't.  I promise I won't tell anybody.  Don't kill me, don't, please.'

"Q   Then what happened?

"A   Went on down to the top of the bank, and right about there she slipped and fell into the water.

"Q   What happened after that?

"A   Shawn got in, then I got in the water.  And I told him, 'Shawn, don't do this,' and he pushed her head under water and held it there.

"Q   Would you tell us what happened from that point on?

"A   He was holding her head under the water, and I was still stoned.  I didn't know what was going on.  I was scared.  And so I pushed him away and I grabbed her and started giving her chest compressions on the chest.  And then he pushed me back.  And then he grabbed her again and put her head under water.  And I don't recall how long he held it under.

"Then I lift her back up again so I could see again, and then I slipped and fell and I hit my head.

"Q   What happened after that?

"A   I was sort of dazed for a few minutes.  Then I grabbed her again and started giving her CPR, and that's when he

grabbed her head and pulled it back and sliced her throat.

"Q Mr. Beam, how long would you say that Shawn Scroggins held Mandy Lenten under the water each time he did that?

"A A couple of minutes. I'm not really too sure.

"Q Mr. Beam, do you recognize State's Exhibit No. 43?

"A Yes, I do.

"Q Mr. Beam, is this the knife that Shawn Scroggins slit the throat of Mandy Lenten with?

"A Yes.

"Q Would you tell us what happened after Mandy Lenten's throat was slit?

"A After her throat was slit, I couldn't stand the blood. I almost passed out. So I pushed her head under the water and held it there.

"Q How long do you think you held her under water?

"A I'm not sure. I just looked away and held her head down.

"Q Did you hold it down until she quit wiggling?

"A She only wiggled once.

"Q What was done with the handcuffs?

"A They was taken off and handed back to me after we left there. They was handed back to me by the Red Steer.

"Q Who took them off?

"A Shawn.

"Q What was done with Miss Lenten's body?

"A It was left there.

"Q Both of you were wet at that time?

"A Yes, we was.

"Q Do you remember what type of shoes Mr. Scroggins was wearing that evening?

"A Tennis shoes.

"Q Where did you go after having observed the handcuffs being removed?

"A To James West, which is Wes Short's.

"Q What happened at Wes Short's?

"A When we got to Wes Short's, we both knocked on the door. He was asleep, and he came out. We were both very scared, and we went in. And he goes, 'What's wrong?' And we told him what happened. And after we told him, Shawn goes, 'I didn't do nothing, it was all you that done it. I didn't do nothing.' He tried to blame it off on me.

"And at that time Wes goes, 'Well, my advice would be for you to leave town, in talking to me.'

"Q Did you see the knife at Wes Short's?

"A Yes, I did.

"Q Did you see anything done with the knife?

"A Yeah, Shawn was playing with it, waving it back and forth.

"Q Was there anything else done with it?

"A Yeah, it washed it at that time.

"Q Do you know where he washed it?

"A In the kitchen.

"Q Do you remember if there was any discussion about Mr. Scroggins's tennis shoes at Wesley Short's?

"A Yes.

"Q What were those discussions?

"A He asked Wes, 'What did I do with my tennis shoes?' And Wes goes, he goes, 'Get rid of them. Throw them away or burn them.' And Shawn did decide to burn them.

"Q Did Mr. Scroggins tell you anything about being silent about the events of that evening?

"A Yes. He said, 'You don't tell nobody and I won't tell nobody.'

"Q Mr. Beam, all of these events occurred in Nampa, Canyon County, Idaho, is that right?

"A Yes.

"Q Where did you spend the night?

"A At Sandy's.

"Q   How did you get there?

"A   Wes took me.

"Q   Did you go anywhere the next day?

"A   Yes, I did, about noon.

"Q   Where did you go?

"A   To Caldwell.

"Q   Who took you to Caldwell?

"A   Wes.

"Q.  Anybody else?

"A   Shawn and his mother.

"Q   Where did you go from there?

"A   Well, they took me over to Circle K on Kimball, and I went down to Linda Page's house. I can't remember the exact address. It was about maybe three blocks away.

"Q   Where did you go from there?

"A   To the Marsing Junction to go to Nevada.

"Q   Were you apprehended in Nevada?

"A   Yes, I was.

"Q   Were you interviewed in Nevada?

"A   Yes.

"Q   At the time you were interviewed, did you have any idea at all that there had been tennis shoe footprints found at the scene of Mandy Lenten's death?

"A   No, I did not.

"Q   At that time did you tell the officers Shawn Scroggins was wearing tennis shoes that night?

"A   Yes.

"Q   Did anything happen to your thumb while Mandy Lenten was being killed?

"A   Yeah.

"Q   What was that?

"A   It got punctured.

"Q   How did that happen?

"A   With the knife.

"Q   Will you tell us how that happened? Where were you—where was your hand?

"A   I was standing by Mandy on the left side, and Shawn on the other side. And when he went to slice her throat, I was just

giving her CPR on her chest, and I moved my hand back, and I went to push the knife away, and it hit my thumb.

"Q   Ray, when you were down in Nevada talking to the police officers when you first talked to them, did you know that Shawn had devised that you had committed this crime?

"A   No, I did not.

"MR. JONES: Thank you. That's all the questions I have.

"COURT: *Cross examination by Defendant Beam?*

"MR. BISHOP: Your Honor, at this time I have no questions. I would anticipate calling Mr. Beam to the stand at a later date.

"COURT: *Cross examination by Defendant Scroggins?*

"MR. BISHOP: Your Honor, prior to cross-examination by Mr. White, I would ask that Jury A be removed. I feel this would be proper in light of the two-jury system.

"MR. JONES: May we approach the bench on that, Your Honor?

"COURT: Approach the bench.

(Whereupon, an off-the-record bench discussion was had between Court and Counsel.)

"COURT: I am going to ask that Panel A step down.

(Whereupon, the Bailiff escorted Jury A out of open court and certain proceedings were had in the absence of Jury A. The noon recess was taken from 11:45 to 1:30 p.m. Reconvened. Counsel for respective parties, together with the Defendants, present. The following proceedings were had in the absence of both Jury A and Jury B.)"

Tr., Vol. 4, pp. 838–62 (emphasis added). It will be forever unknown, at least by resort to the records on both appeals, what was agreed to by the court and defense counsel at the bench conference. All that we do know—from the record—is that counsel for the state, in the presence of both juries, requested and obtained an "off-

the-record" bench discussion just prior to cross-examination of Beam by Mr. White, counsel for Scroggins. And we do know that the "off-the-record" discussion took place, and there was not any cross-examination of Beam by counsel for Scroggins. We do not know what was said in that important bench discussion—the result of which was no cross-examination.

What we also do know is that appellate review of an incomplete record is virtually impossible. As Justice Bakes wrote in *State v. Wright*, 97 Idaho 229, 542 P.2d 63 (1975): [2]

> When this Court is unable to review the proceedings of the lower court because, in violation of the statutes of this state, the record of those proceedings was not properly taken and preserved, and due to the record's deficiencies we are unable to determine whether a defendant's judgment of conviction has been obtained in a proceeding tainted with fundamental error, then we must apply the rule of *Ebersole v. State*, 91 Idaho 630, 428 P.2d 947 (1967), where we stated:
>
> > "Appellant's dilemma was not of his own making. The statutory provisions requiring the recording of oral proceedings by the court reporter ... are fairly designed ... to protect a defendant from the very situation now before this Court.
> >
> > ....
> >
> > "When there is such a breakdown in the application of established procedures, as is reflected by this record, which necessitated resort to the parol evidence of court officials and of the appellant himself to establish what took place in a court of record, there is such a lack of fundamental fairness and deviation from established rules of procedure as to necessitate the conclusion that appellant has not been afforded the protection of the due process clauses of the Constitu-

tions of the United States and this State." *91 Idaho at 636, 428 P.2d at 953.*

*Ebersole's* requirements are clear—*when no record of certain proceedings before the district court is available, but had a record been available it might have substantiated the defendant's allegation that there was prejudicial error in those proceedings, a judgment of conviction based upon proceedings cannot be sustained;* otherwise, the defendant has been denied due process in violation of the Constitution of the United States and of the State of Idaho.

In essence the rule of *Ebersole* is that in this case we must reach our decision as if the record shows, as the appellant alleges in his brief, that the prosecuting attorney in his closing argument referred to the appellant's exercise of his Fifth Amendment right to remain silent as evidence of his guilt. To do otherwise would deny him due process of law. In this circumstance, I would adopt the holding of the Tenth Circuit in *United States v. Nolan*, 416 F.2d 588 (1969), which said the following in connection with this matter:

> "We see no difference in principle in the exercise by the defendant of his constitutional right not to testify and his constitutional right to remain silent and refrain from making either an inculpatory or exculpatory statement to the officers when taken into custody for a federal offense. In either case, the comment [by the prosecutor that the defendant's failure to make exculpatory statements to the arresting officer was evidence of his guilt] would greatly impair such privilege and penalize the exercise thereof. Apposite is the language of the Supreme Court in *Griffin v. California*, 380 U.S. 609, at page 614, 85 S.Ct. 1229, at page 1233 [14 L.Ed.2d 16 (1965)]: 'It is a penalty imposed * * * for exercising a constitutional privilege. It cuts down on

---

2. Justice Shepard, there authoring the Court's opinion for the majority of three, argued only that "Even assuming that the error alleged of non-reporting is of constitutional dimension there is no showing of resulting prejudice." His opinion did not question the validity of *State v. Ebersole*, 91 Idaho 630, 428 P.2d 947 (1967).

the privilege by making its assertion costly.'

"*We think the error committed was so plain, fundamental, and serious that we should consider it, although timely objection was not made thereto in the trial court.*" 416 F.2d at 594 (footnote omitted).

*Wright, supra,* 97 Idaho at 235–36, 542 P.2d at 70 (emphasis added).

*State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981) was the first case to reach this Court after the present death sentence penalty law had gone into effect. There Justice McFadden wrote for the Court that which has continued to guide the Court's mandatory review of the record, together with a defendant's appeal, where the sentence of death was imposed:

This general rule applicable to appellate review of error is not necessarily controlling where we are statutorily required to undertake appellate review irrespective of the defendant's contentions, if any. Death is clearly a different kind of punishment from any other that may be imposed, and *I.C. § 19–2827 mandates that we examine not only the sentence but the procedure followed in imposing that sentence regardless of whether an appeal is even taken. This indicates to us that we may not ignore unchallenged errors. Moreover, the gravity of a sentence of death and the infrequency with which it is imposed outweighs any rationale that might be proposed to justify refusal to consider errors not objected to below.*

Other jurisdictions similarly do not allow technical appellate rules to preclude a comprehensive review of those cases where a sentence of death has been imposed. *See e.g., State v. Brown,* 607 P.2d 261, 265 (Utah 1980); *Commonwealth v. McKenna,* 476 Pa. 428, 383 A.2d 174, 179–80 (1978); *State v. Ceja,* 115 Ariz. 413, 565 P.2d 1274, 1276 (1977); *cert.den.,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977); *State v. Martin,* 243 Iowa 1323, 55 N.W.2d 258, 260–261 (1952); *Tuggle v. State,* 73 Okl.Cr. 208, 119 P.2d 857, 859 (1941). *We have previously recognized as much in this state by holding that fundamental error, even absent objection at trial will be reviewed on appeal. State v. White,* 97 Idaho 708, 714, 551 P.2d 1344, 1350 (1976), *cert. den.* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976); *State v. Haggard,* 94 Idaho 249, 251, 486 P.2d 260, 262 (1971). *Osborn, supra,* 102 Idaho at 410–11, 631 P.2d at 192–93 (emphasis added).

There is nothing in the record to justify or even explain why counsel for Scroggins did not cross-examine Beam. Beam's attorney had good reason to not want Beam subjected to Mr. White's inquiring cross-examination, but Beam, as any witness, having voluntarily taken the stand, was as subject to cross-examination as any other witness who takes the stand. And, Mr. White, a most able practitioner, would have been remiss in his duties had he not cross-examined a state's witness who had just put the finger on his client. It is logical to assume that in the off-the-record bench discussion the trial court was momentarily confused as to the reason which lays behind the *Bruton* rule, or, was simply applying the game plan which he had earlier devised—calling for spot rulings.[3] Actually there is

---

3. At the hearing on the prosecutor's motion for a joint trial with two juries, after hearing objections and comments of counsel for both defendants, the trial court said in part:

COURT: Well, for a number of reasons, part of what I have already discussed with you in chambers, the Court is leaning toward the empaneling of two juries, not only because of judicial economy that can be gained thereby, but also assuring both Defendants a fair trial.

I think Counsel for Defense is right in that it is more than just maybe statements or things of that nature that the Court has to be concerned about. It would be Defense witnesses that may be produced as to the other Defendant. But I think that is true, *that can be handled in a chamber conference with the court.*

*I want to make it very clear,* whether it is a total severance or whether it is a hybrid thereof, *the Court is going to control the procedure.* I will take my chances if there is any error, but *I am not going to be dictated as to how things are going to be run or who is going to be*

no way of knowing from the record to which we are confined. When Scroggins' attorney was not allowed to cross-examine Beam, the trial was becoming farcical. The hybrid two-jury, joint trial system was supposedly being used to circumvent any prejudice which would be occasioned by introduction of any confessions made by either of the defendants where the defendant did not take the stand. The rule of and for *Bruton* is that you cannot cross-examine a confession, and hence the right of confrontation is defeated.

Here, however, Beam testified. And he was accordingly subject to cross-examination by his co-defendant's counsel. In that way, and only in that way, "the search for truth" would have been promoted. The trial court, apparently seeing no difference between Beam's live testimony and the hearsay use of his oral confession to the police officers, applied the *Bruton* rule to both.

After Beam testified against himself and against Scroggins, the prosecution called one more witness and then rested. Mr. Beam was for a second time placed on the stand, on his own case, and this time the Scroggins jury was excused. The only material testimony given by him was to respond: "No, I did not," when asked "Did you at any time intend to kill Mandy Lenten?" With the Scroggins jury out of the court room, Beam's additional case was three character witnesses, only one of whom was questioned by the prosecution. Such was the end of the proceedings before the Beam jury, other than a state's witness, previously not available, testified and was cross-examined. Thereupon the following took place:

MR. BISHOP: Yes, I have concluded, and we rest at this time.

*present when certain evidence is coming in.* You make your presentation to the Court, and I hopefully will fairly consider them. But *when the decision time comes, I will make the decision.*

Tr., Vol. 1, pp. 12–13 (emphasis added).

[MR. BISHOP:] It is my understanding, just for clarification of the record, that you are, then, ordering the—or granting the State's motion for severance and joint trials, the two-jury trial system? I don't believe that is in the record, other than by letter of indication.

COURT: There does need to be some clarification. It is going forward downstairs with two juries. The Defendant's motion, if there was a motion to sever, is denied. We are going forward with two juries.

MR. BISHOP: Your Honor, I have not filed a motion for severance. The State filed a motion for severance, to try it as two juries.

COURT: I stand corrected. It was the State's motion to sever. That motion is denied.

MR. BISHOP: As a joint trial, one jury.

COURT: No, under—

MR. BISHOP: Well, Your Honor, under Section 19-2106 we have a joint trial with one jury or we have severed trials whereby each Defendants has a jury. And under Mr. Haynes's motion, he stated to the Court they were asking for severance but to proceed with two juries. And if we are proceedings with two juries, it would be my understanding that the cases are severed; we have separate trials as to each Defendant, and each Defendant having their own jury, or we have a joint trial with one jury.

COURT: I guess it is a question of semantics. It's severed on issues not relevant to one Defendant. It is being tried jointly as to all other matters.

MR. BISHOP: So the cases are severed, but we will have two juries.

COURT: I want to be absolutely certain that Counsel and the Court understand each other upon what we have agreed. By the way you are talking about severance, *I am not going to entertain any argument that anybody but that the Court is controlling what evidence is going forward with both Defendants present. I do not want an argument that the Court has ordered severance so we have an automatic right to have certain evidence heard only by one jury. The Court will control that.*

What I am trying to tell Counsel is that this is really a type of a hybrid, and we are just arguing over semantics. But to avoid any prejudice to either Defendant, in the interest of judicial economy, and to avoid any Bruton problems, the Court has ordered two juries to sit simultaneously. We are going forward with the evidence. And when there is evidence to be introduced that is not admissible as to one Defendant, that jury will be removed.

MR. BISHOP: Your Honor, maybe we are talking semantics, but I have to try a case. And all of the authority for two juries, it is a severed trial. You used the word hybrid. I don't of any authority for a hybrid trial.

COURT: I have not seen any authority to the contrary.

Tr., Vol. 1, pp. 29–32 (emphasis added).

COURT: Mr. Bishop, you're not going to want your jury present during Mr. White's presentation?

MR. BISHOP: That is correct, Your Honor.

COURT: For their own convenience, subject to call of the Court, I am going to allow them to go back to the motel.

MR. BISHOP: I definitely concur with that, Your Honor.

COURT: The Court is going to excuse Jury A back to the motel, and we will call in Jury B.

....

MR. BISHOP: Your Honor, Mr. Beam has inquired if he has to be here during this segment. I see no purpose for him being here during this segment.

COURT: I think he can waive his appearance as far as Defendant Scroggins's case is concerned.

MR. BISHOP: Your Honor, he has indicated to me that he would waive his right to be here during this episode or presentation of the Defense of Mr. Scroggins to Jury B.

COURT: Is that correct, Mr. Beam?

MR. BEAM: Yes, sir, Your Honor.

COURT: You prefer to be outside of the courtroom during the presentation of Mr. Scroggins's testimony?

MR. BEAM: I don't see why I should be here.

COURT: That means you would not hear it, so you would not be in a position to advise your counsel one way or the other.

MR. BEAM: That's right.

COURT: How does the State feel about that?

MR. HAYNES: Your Honor, I realize that Mr. Beam may have a right to not be present during the presentation of Mr. Scroggins's case, but both Defendants have been seated there with all the evidence coming in. I don't see how it could be prejudicial to his case during the presentation of Mr. Scroggins's evidence.

Inasmuch as all of the Defendants have been present each day and each session, and inasmuch as the jurors in each situation are lay people involved in this situation and are possibly going to draw certain conclusions from the absence or presence of Defendants, I think it would be more beneficial to everyone if Mr. Beam would stay. I don't see how it prejudices him in any way.

And I can't point to any specific prejudice in the State's case, but it seems that in this unique situation, with lay member sitting in on a very new law process, that an improper conclusion could be drawn from the absence of Mr. Beam at this critical point.

MR. BISHOP: I think he has the right to waive his appearance in the proceedings themselves. After being fully advised, and the State not having shown any bias or prejudice, and he has asked, and I concur, there is no value to his being present. And I question the value of my being present during this segment. But I see no reason why he could not be allowed to leave.

COURT: I think on further reflection, I believe that the Court is inclined to agree with the State. I think Mr. Beam is not really in a position to waive his presence here inasmuch as there could be matters that could come up in the presentation of Mr. Scroggins's case that could bear on his own case.

And if that information is relayed to him by Counsel or otherwise, unless it is given in specific form in which it was presented, he may or may not be in a position to rebut it. And I don't want something like that to come up at a later time.

MR. BISHOP: Your Honor, with that analysis, we are proceeding under severed juries. He would not be present, necessarily, if we had two separate trials going on. And I think that the only resolution that can be taken from that is there an illusion that the State may be prejudiced if he is not here.

MR. WHITE: Your Honor, if I may inject. I don't care if he stays or does not stay, but it appears to me that the State and Mr. Beam have rested their

case. What reason would there need be rebuttal in his case is beyond me. The record reflects that both Mr. Beam and the State have rested in that case.

COURT: I don't think there is any prejudice, and I hope there is not any prejudice, since this is a unique situation, but there certainly cannot be anything wrong with him being here in case there is something that we have not anticipated. I am going to request Mr. Beam remain present. Bring in Jury B.

(Whereupon, Jury B was escorted into open court.)

COURT: Jury A is excused to the motel until tomorrow morning, January 20th, at 9:00 a.m.

(Whereupon, Jury A was excused to the motel until 9:00 a.., January 20, 1984, and certain proceedings were had in the absence of Jury A. Thereafter, the Court recessed until 9:00 a.m., January 20, 1984.)

Tr., Vol. 5, pp. 978–83.

In order to ascertain what happened thereafter in the joint trial (which was no longer joint), it becomes necessary to go outside of the record before us in the Beam appeal, and pursue the record in the Scroggins appeal. The Beam jury, as the court ruled, was not instructed and sent out to deliberate, but put on hold at a local motel—while Beam and his attorney sat through the remainder of the joint trial.

Somewhere in one of the two records there may be a notation that the state rested its case against Scroggins at the same time that it rested the case against Beam, but it escapes me. At any rate, after Mr. Beam was kept in court, Scroggins' jury was brought in, and his attorney made an opening statement. The first witness called to the stand was Scroggins. He testified to his age, which was 18 years—three years younger than Beam—and, after some other introductory questioning, got down to the events of July 7, the night Mandy Lenten was killed:

"Q  What occurred, Shawn?

"A  So he asked me if I could search through my wallet and see if I had it. And I said, 'Well, I don't have it.' And he said, 'Well, go ahead and check.' And I said, 'No, I'm not going to check 'cause I go through my wallet three times a day.'

"Q  Then what happened—by the way, Shawn, was it dark?

"A  Yes, it was.

"Q  Was it very dark?

"A  Pretty dark, yes.

"Q  And what occurred then?

"A  Well, we were sittin' there, and he reached in his coat pocket and pulled out the handcuffs and reached over there and stuck 'em on her.

"Q  On the front or back?

"A  The front. And I asked him what he was doin'. And he didn't answer me.

"Q  Then what did he do?

"A  He placed her hands on top of her head in front of her, like this (indicating).

"Q  Was she seated on the ground or laying on the ground?

"A  Laying.

"Q  And he put her hands up over her head?

"A  Yes, sir.

"Q  Then what did he do?

"A  He proceeds to take off her pants.

"Q  What did you do?

"A  I got up and started walkin' off.

"Q  Did you know what he was going to do?

"A  No, sir.

"Q  Did you think he was going to have sexual intercourse with the girl?

"A  Well, it was lookin' that way, yes.

"Q  What did he do before you walked away that made it look that way?

"A  Well, he was pullin' off her pants and pullin' down his.

"Q  So you turned and walked away.

"A  Yes, sir.

"Q  Where did you walk to?

"A  Over here, in here (indicating).

"Q When you're saying 'over here,' you're pointing to—

"A Around the tree here.

"Q By the creek bank?

"A Yes, sir.

"Q About how far away is that, Shawn?

"A Ten to fifteen feet.

"Q Was that your approximation?

"A Yes, sir.

"Q Did you watch at any time everything that Mr. Beam did?

"A No, sir, I didn't.

"Q Did the girl ever scream?

"A No, she didn't.

"Q How long—did you watch part or try to look back at him, or what did you do?

"A I was just standin' there. I didn't even want to look.

"Q Because he was participating in this sexual act?

"A Yes, sir.

"Q How long did this continue?

"A For about a half an hour.

"Q During all of this half an hour, the girl didn't scream?

"A No, sir, she didn't.

"Q Then at some point did you go back over where they were at?

"A Yes, sir, I did.

"Q And what did you do when you arrived back where they were at?

"A I got down and was gonna do the same thing he was doin'—

"Q Did you take your pants down?

"A A little, yes.

"Q Down below your knees?

"A No, above them.

"Q When you walked back over there, did she have panties on?

"A No, sir, she did not.

"Q What occurred then, Shawn, when you got down and started doing it to her? What did you do?

"A I looked on her face, and she had a puzzled look on her face, and I asked her, 'Do you want to do this? Are you willin'?' And she said, 'I don't know.' So I got up, pulled my pants back on, lifted her up and pulled her pants back on. And I was fixin' to ask Ray Beam for the knife to unhandcuff her.

"Q What did he do?

"A Then he came over there and grabbed her and took out the knife, opened the blade, and I thought he was going to unhandcuff her and let her go. And he placed her hands behind her back. And I said, 'What are you doin'?' And he said, 'Well, I can't take a chance on her tellin' on me.'

"Q Did he have the knife in his hand?

"A He sure did.

"Q Where did he have it?

"A What do you mean by that?

"Q Did he have it pointed at the girl?

"A Well, I think so. I don't know for sure. I didn't even want to look.

"Q Was any conversation had between you and Mr. Beam?

"A Yes, sir, I told him not to be doing that, that it wasn't right, and that he would get in trouble for it. And he said that 'I can't take a chance she'll tell on me.'

"Q Did you say anything else to him— by the way, where did this occur, Shawn?

"A We was right there. He unhandcuffed her and handcuffed her hands behind her back right there and started walking her up that way (indicating),

"Q Which hand did he have her in?

"A His right hand.

"Q Did he have a knife?

"A Yes, he sure did.

"Q Which hand was that in?

"A In the left.

"Q Did you yell at him or try to stop him?

"A  I told him not to do it.

"Q  What did you say?

"A  I said, 'Ray, will you please stop. Don't do that.'  And he says, 'I can't take a chance.  She'll tell on me what I did.'

"Q  Did the girl say anything?

"A  She said she wouldn't say anything.

"Q  To him?

"A  Yes, sir.

"Q  At this particular time, which direction was he headed with the girl?

"A  Up that way there (indicating).

"Q  In a northerly direction?

"A  Yes.

"Q  To the top of that diagram, which is State's Exhibit 2AB?

"A  Yes, sir.

"Q  So you're pointing to the top of that, are you not?

"A  Yes, I am.

"Q  What did you do?  Did you hear anything or see anything?

"A  Well, I seen him take her to this point here, to the top of the ditch bank there.  And I went down to where the water come out of the pipe.  And I was standing there.  And I heard her say no, then a whole bunch of water splashin'.

"Q  What did you do?

"A  I freaked out and turned around and ran.

"Q  Which direction did you run?

"A  Back down the alley this way (indicating).

"Q  Did you go back through the same way you came?

"A  Yes.

"Q  Was there a dirt path there?

"A  What do you mean?

"Q  When you said there was a path there, did you go back out the same path?

"A  Yes, I did.

"Q  At that time, Shawn, how far did you run?

"A  About four, four and a half blocks.

"Q  Was there any particular location that you ran to that you remember?

"A  Yes, the Red Steer.

"Q  How long—did you ever see Ray Beam again that evening?

"A  Yes.

"Q  When did you next see him?

"A  Well, I had to stop and catch my breath, and as I was sittin' down, I was fixin' to get up and take off again, and I happened to turn around and he was right there.

"Q  Was he barefooted?

"A  Yes, he was.

"Q  What happened?

"A  He said, 'Why did you run?  Are you going to tell on me?'

"Q  How did he say that?

"A  What do you mean, how he said it?

"Q  Was he excited?

"A  He looked like he was—had done somethin' wrong.  He was wet and all of that.

"Q  Was anything else said there?

"A  He said, 'Well, you're gonna go tell on me, ain't you?'  And I said no.  And he says, 'Well, if you tell on me, you'll go down with me.  And when you go down with me, you'll get the same thing.'

"Q  Then what happened?

"A  So we was walkin' back to Wes's house.

"Q  Is that up 12th Avenue?

"A  Yes, sir, between Red Steer and the hospital.  That's when he gave me my knife back.

"Q  What condition was your knife?

"A  It was muddy, wet, and it had sand all in it.

"Q  Did you go to Wes Short's house?

"A  Yes, sir, we did.

"Q  When you arrived at Wes Short's house, did you knock on the door?

"A  Yes, we did.

"Q  What occurred?

"A  He opened the door, and he said, 'What do you want?'  And I asked, 'Could we come in?'  And he said, 'Okay, come on in.'  And we went in, and Ray Beam asked if he could use the telephone.  And Wes said sure.  So he went straight to the telephone.

"Q  What did you do?

"A  I went in the bathroom and got undressed and put a pair of shorts on of Wes's and got ready for bed.

"Q  What did you do with your pants?

"A  Stuffed them in there in the washroom.

"Q  Did you have them laying in any particular place?

"A  On the dryer.

"Q  What did you do with your shoes?

"A  I had them there, too.  I took them off.

"Q  Now, you put on a pair of shorts?

"A  Yes, I did.

"Q  Was there any conversation at Wes Short's house about what occurred that night?

"A  Yes.

"Q  Between you and Mr. Beam?

"A  Yes.

"Q  Where did this occur?

"A  In the living room.

"Q  What did you do with your knife?

"A  What did I do with it?  I still had it in my pocket in the washroom.

"Q  Did you ever go and get it out?

"A  Yes, I did.

"Q  What did you do with it?

"A  I took it in the kitchen and washed it off.

"Q  Did you notice any blood on it?

"A  No, sir, I didn't.  I wasn't lookin' for it.

"Q  Did Ray Beam remove his clothes while at Wes Short's?

"A  Yes, he did.

"Q  What did he do with his clothes?

"A  He went in the bathroom and changed.

"Q  Did he put them anywhere?

"A  He stuck them on top of mine.

"Q  In the washroom?

"A  Yes, sir.

"Q  Did you and Ray Beam have any conversation about the events of that night?

"A  Yes, sir.

"Q  At Wes Short's?

"A  Yes, sir.

"Q  What did you say to him or he say to you?

"A  He told me that—I don't know how it started off, but he told me that I had just as much to do with it as he did.  And I jumped up and said, 'That's a damn lie.  You know good and well I wasn't down there and I didn't do anything.'

"Q  What did he say?

"A  He kept accusing me, like I had done it, like I had done it.

"Q  Did he threaten you?

"A  Yes.  He said the same thing as I was sittin' at the Red Steer, that if I said anything, that I would go down along with him and get the same thing that she had got.

"Q  During that conversation, did he disclose to you what he had done to that girl?

"A  He said that he drowned her and cut her.

"Q  And did he say where he had cut her?

"A  No, sir, he sure didn't.

"Q  Now, I believe you made a statement that you told Wes Short the whole story that night.

"A  Well, in the discussion, Wes was sittin' in the livin' room where we was talkin' about it.  And I really can't recall if he was really actually listenin', but in my mind I wanted him to listen.  I, in my mind, thought he was overhearing our conversation that we was havin'.

"Q What was the purpose of Mr. Beam making a telephone call?

"A To call his girlfriend that lived in Caldwell so she could come and pick him up and take him across the state line.

"Q Is that what he said?

"A Yes.

"Q Did you talk to this girl on the telephone?

"A Yes, I did.

"Q Do you know who she is?

"A No, I sure don't.

"Q Do you know what her name is?

"A No, sir.

"Q Did he mention a name to you that evening, Shawn?

"A Yes, sir, he did.

"Q What then occurred?

"A Well, we were having the argument, and in my mind I was hoping Wes was overhearing it. At that time I thought he was.

"Q Did Ray Beam leave Wes Short's that evening?

"A Yes, sir, he sure did.

"Q Approximately what time was that, if you know? Was it after midnight?

"A After around 2:00 to 3:00.

"Q And did he take his clothes with him when he left?

"A Yes. He went in there and got them off the washer and dryer and folded 'em up.

"Q Then who took him home, or did anyone take him home?

"A Yes, Wes Short did.

"Q And how long was Mr. Short gone?

"A Fifteen to twenty minutes.

"Q What happened next that you know of?

"A Well, I was in there on the bed, getting ready to go to sleep, and all I could think about was having seen and what having happened and he was accusing me and threatening me and telling me I was gonna get the same thing if I said anything.

"Q Did you sleep that morning, early morning?

"A Excuse me?

"Q Did you sleep that early morning?

"A Did I sleep?

"Q At Wes Short's house.

"A Well, I fell asleep, yes, and all through the night I kept wakin' up.

"Q What occurred next?

"A All I can remember is Wes Short came in the room and was wakin' me up, and I woke up and said, 'What?' And he said, 'Ray Beam is here to see you.' And I said, 'What in the hell is he doin' here?' And I asked him to please make him leave, that I don't want to see him. And he walked in, opened the door and said, 'Come in.'

"Q What did—do you know the purpose of why Ray Beam was there?

"A Yes, sir.

"Q What was that?

"A To ask Wes Short if he could drive him to Caldwell.

"Q Do you know if Wesley Short did drive him to Caldwell?

"A Yes.

"Q How do you know that?

"A Because me and Wes and Ray Beam got in the truck and went over to pick up his stuff that he wanted to get.

"Q Where was that?

"A At Sandy Wahlen's.

"Q Where was that, again?

"A 1023 South Ivy.

"Q The same apartment building where you lived?

"A Yes.

"Q What all did he get?

"A I don't know, I don't recall.

"Q Did he pick up some personal things?

"A Yes, clothes and stuff, things like that.

"Q Then what happened?

"A Wes Short said, 'Are you ready?' And we said yeah. So me, my mother and Wes and Ray Beam got in the truck and took him to Caldwell.

"Q Do you know where you took him?

"A Circle K.

"Q And what happened at the Circle K?

"A We pulled up there. He was in the back of the pickup. He jumped out, got his clothes and walked up to Circle K by the telephone booth.

"Q What did you and your mother and Mr. Short do?

"A Well, as we were pullin' up the driveway, I happened to look back to make sure that he was gone. And when I made sure he was gone, I broke down and told my mom what had happened.

"Q What did she do?

"A She didn't believe me at first.

"Q What did Wes do?

"A He didn't believe me at first.

"Q Where did you go?

"A Wes was heading back to Nampa.

"Q Was there any conversation about where you wanted to go?

"A Yes, there was.

"Q What did you say to your mother and Wes?

"A Well, my mom happened to mention, 'Do you want to go to the hospital?' And Wes asked me if I wanted to go see the priest. And I said, 'No, I want to go see the police.'

"Q Did you?

"A Yes, I did. I made them take me there.

"Q And when you arrived at the police station, who did you talk to?

"A Randy Twedt.

"Q Would that be Gary Twedt?

"A Yes.

"Q Did you talk with a Randall or Randy Newton?

"A Yes, sir.

"Q Did you more or less attempt to tell them what you had been involved with and seen and heard?

"A Yes, sir."

Tr., Vol. 5, pp. 1050–67.

"Q Shawn, did you see Ray Beam actually drown the girl?

"A No, I didn't.

"Q Did you see him holding her head under the water?

"A No, I didn't.

. . . .

"Q When did you find out, Shawn, that the girl's throat had been cut?

"A Monday, after they arrested me.

"Q How did you find that out?

"A Gary Twedt told me."

Tr., Vol. 5, pp. 1076–77.

Cross-examination by the prosecutor brought out some discrepancies in Scroggins' trial testimony as compared to his statements given to the police. Of significance, Scroggins, however, had a ready answer for every thrust made at him by the prosecutor. The prosecutor did make some inroad with respect to Scroggins' direct testimony that the girl had been killed by drowning:

"Q Now, just to be sure, you told the jury today that at Wesley Short's house Mr. Beam told you that he cut the girl.

"A Yes.

"Q You're sure of that.

"A Yes.

"Q Go ahead and read with me, and your counsel will help if I am reading anything wrong, Mr. Twedt said, 'Did he tell Wes that he'd raped the girl?' Your answer was, 'Yes, and he told me and Wes that he killed her.' Mr. Twedt says, 'Uh-huh.'

"Then you said, 'And then that's when, you know, that he used—he used my knife, and that's when I got pissed and jumped on him.' And Mr. Twedt said, 'He told you and Wes that he cut the girl?' Your an-

swer was, 'No, not cut it.' And Mr. Twedt said, 'What?' And you said, 'He—I didn't even know nothin' about cuttin' until just now.'

"And I believe this interview was on July 11th. And you said, 'I didn't even know nothin' about cuttin' until just now.' And Mr. Twedt went on to say, 'He said that he'd used your knife, though?' And you said, 'Yeah.' Mr. Twedt said, 'Okay. Did he tell you how he killed her?' And you said, 'Huh-uh, he just said that he drowned her.'

"Mr. Twedt says, 'Okay.' And you say, 'He didn't say anything about cuttin' her or anything.' Are you reading along with me there?

"A Well, I see what it says there.

"Q This was July 11th that you told the police you didn't know 'nothin' about cuttin' until just now?

"A Yes.

"Q You said he used your knife?

"A Yes."

Tr., pp. 1099–1100.

And again the prosecutor had success with this line of questioning relative to Scroggins' statements to the police:

"Q And yet over and over when they asked you if you had any contact with her, 'Did you touch her, did you go near her?' you would say over and over, 'No,' is that right?

"A That's right.

"Q I think I counted, and I will stand corrected if this is wrong, seven different occasions when they asked you, 'Did you touch Mandy? Did you go near her? Did you have sexual relations with her?' And what would your answer be?

"A I would say no.

"Q But in reality you did, didn't you?

"A I didn't touch her, no, and I didn't have sex with her, no.

"Q But you did get on top of her.

"A I started to.

"Q You did tell the police that you started to put it into her, didn't you?

"A I don't recall saying that. I could have.

"Q Would you like to see where you did?

"A Yes, I would.

"Q Go ahead and look at what has been marked as Exhibit 15, Scroggins Tape 8, Exhibit 15. For the benefit of Counsel, we are looking again at the second Scroggins line. You're saying here you don't remember telling the police, 'I didn't stick it into her, but I started to.'

"A My second name down?

"Q I think we've already talked about this one, but I wanted to be sure that it was there.

"A Yes, I see that.

"MR. WHITE: Which page, please?

"MR. HAYNES: Page 9."

BY MR. HAYNES:

"Q 'I didn't stick it into her or anything like that, but I started to.'

"A Yeah, that's right.

"Q So you did start to have sexual relations with her.

"A Yes.

"Q That was after you had denied it over and over and over. Then you finally told the police what you actually did, is that correct?

"A That's correct.

"Q You told the police what you had done sexually with Mandy only after they had arrested you, is that correct?

"A That's correct.

"Q Only after they had arrested you and told you you were under arrest for First Degree Murder and Rape, then you wanted to talk to the Detectives that morning over at the Nampa Police Station.

"A Yes, that's right.

"Q And that's when you began to tell the truth about your sexual relations with Mandy.

"A Yes."

Tr., Vol. 5, pp. 1111–13.

And again:

"Q Now, I'm going to talk about the rape scene. I'm going to talk about just what was happening right here. You said you walked away to this tree.

"A Yes, sir.

"Q According to your testimony, you must have stood there about a half an hour.

"A That's right.

"Q In that half an hour, you're saying that your acquaintance or your friend, Mr. Beam, had this girl handcuffed and had a knife to her throat, is that right?

"A Well, I guess when he was takin' her down the—

"Q Now, I'm not talking about taking her anywhere, I'm talking about when she was on the ground and you say he raped her for a half an hour.

"A Yes.

"Q Are you telling the jury that you just stood at that tree and didn't go for any help?

"A No, I'm not saying that, no.

"Q What?

"A Well, I'm saying I stood by the tree. I wanted to go for help.

"Q But you didn't, did you?

"A No, I was too scared to do anything, and I still am.

"Q You were too scared to do anything, except you weren't frightened enough you did go back and take your turn with Mandy.

"A No, I did not take a turn.

"Q Started to.

"A Started to.

"Q You were not too afraid to do that.

"A Well, if I wasn't afraid I would have kept on doin' it.

"Q Mr. Beam was there when you started, as you say, to do it with Mandy Lenten.

"A Yes, he was.

"Q You were too afraid to run for help but not too afraid to go and take down your pants and begin to or get on Mandy, depending on which story we're talking about.

"A Well, I didn't know if he was going to turn on me or not if I started to go for help.

"Q Well, Mr. Scroggins, if what you're telling us took place, he's on the ground with Mandy, he has his pants down himself, and you're standing by the tree. There's not much he can do if you go for help, is there?

"A Well, you wasn't there, and I don't know if he could have got up and tried to chase me or not.

"Q But you trusted him enough to take your own pants down and either get on her or start to get on her.

"A Well, I figured if I would go for it, you know, that he wouldn't do anything.

"Q You figured if you went along with Mr. Beam, then he wouldn't hurt you.

"A Yes, that's correct."

Tr., Vol. 5, pp. 1115–17.

And again:

"Q Now, on that Page 10, Mr. Scroggins, right at the top, the first line that says Shawn, you say, 'Yeah.' I don't konw what the question was. Then Newton: 'Was she saying anything? What did he do when he got her down to the water?' You answer, 'Stuck her underneath the water,' is that correct?

"A Yes, that's correct.

"Q Not heard it or saw it in your mind's eye, 'Stuck her underneath the water.' Then Newton asks you a particular question, 'All of her or just her head or—' and you break in, 'All of her.' Is that right?

"A That's what it says, yeah.

"Q Then Twedt asks you a question, 'Did you see that?' And what was your answer?

"A 'Yeah, I did.'

"Q Now, are you telling the jury today that you did not see that?

"A Yes, not seein' it seein' it. That's what I was seein' in my mind.

"Q Is that because it has been proved, Mr. Scroggins, that you could not see it from there?

"A Well, no.

"Q Or is it because that you could accurately describe what happened there and yet you were saying you weren't there?

"A Well, I was there, yes. I seen him take her as far as the edge bank there.

"Q Isn't it more a matter of that you accurately described what was down in the water until you realized that you really couldn't have seen from where you said you were standing?

"A Well, I was referring to seeing him walking her to the edge bank there.

"Q Yet you told the police 'all of her,' not just her said.

"A Yes, that's what it says.

"Q And the only way that you could have seen that, Mr. Scroggins, is if you were down in that water also, right?

"A That's right.

"Q In fact, you told the police that you never left that grassy area.

"A I didn't."

Tr., Vol. 5, pp. 1122–24.

There was redirect, recross, and further redirect and recross. But, in all of this, as with the testimony of Beam, there was no cross-examination by counsel for the still-present-in-court co-defendant Beam. How appropriate to this situation the concerns of the prosecuting attorney:

and inasmuch as the jurors in each situation are lay people involved in this situation *and are possibly going to draw certain conclusions from the absence or presence of Defendants, ... but it seems that in this unique situation, with lay members sitting in on a very new law process, that an improper conclusion could be drawn from the absence of Mr. Beam at this critical point.*

I share that same concern, but am able to see prejudice to the state's case, and to Mr. Beam's case as well. After all, so the jury would wonder, Mr. Beam and his attorney are still in court, but why doesn't Beam's attorney cross-examine Scroggins, the witness who has just placed *all* the blame for the actual killing on Beam?

That the prosecutor did a respectable cross-examination of Scroggins is no excuse for not having what might have been an even more penetrating cross-examination by Mr. Bishop, counsel for Beam.

But the larger problem is the trial court's administering of the *Bruton* rule, as it was here administered for the first time in Idaho, in a jointly-charged, jointly-tried, capital case with two juries—COMPOUNDED by the fact that both of the co-defendants testified and the very reason for the *Bruton* rule was non-existent.

To which I hasten to add another reason why another such an aberration should not again take place—which is to not even bother with the worrisome proposition that the two juries were not sequestered until the end of the first trial day, a Monday, after they had been selected on the prior Friday, and that other reason is this. For appellate review in a capital case, as mandated by statute, the record is a mess. It could only be worse if there had been three or more defendants. My perusal of the record, both in this case and in that of Scroggins, not a labor of love by any means, has convinced me that any judicial economy served at the trial level—which is much to be doubted where actual trial time was less than four days, maybe five with Scroggins' jury—has been eaten up by lack of judicial economy at this level. It was a noble experiment, and nobly has it failed. In regard to which statement I hasten to add that if the experiment had to be tried, the particular trial judge who gave it his best endeavors was in my opinion uniquely suited to preside. Better, however, that the judge had not succumbed to the prosecutor's motion; better that the game should have been played by well-estab-

lished existing rules. It was not the right case for the noble experiment.

What also comes across to me from reading the testimony of both defendants, and examining their statements given to the police detectives, is that Beam is as much the mentally slow person as was Bainbridge as compared to Sivak.[4] I would challenge anyone to read the testimony and statements and argue to the contrary. Yet, Bainbridge was not given the death sentence, but Sivak was, and Beam and Scroggins both were.

My purpose is not to say that the trial court erred in sentencing both to death. But I do suggest that *one* jury, hearing each testify on direct and then on *two* cross-examinations, might have well decided the issue differently than did two juries. Long before the trial both defense counsel advised the court of their thoughts:

[MR. BISHOP:] That is my concern. We have certain rights if they're tried together, and the Prosecutor has certain problems. They alleviate certain problems if the case is severed, and we have certain rights if the cases are severed. I do not see, and I have not researched the specific cases, but I do not see where it is indicated in there that there is any such thing as partial severance. You're either severing it or you're not severing it. And if we are going to have two juries severed, then we must obey all of the rules of a severed trial.

Now, I have made contact with other defense attorneys who have been in a situation where this has come up but have never tried it in that situation, but that is basically the way the Court in those circumstances looked at it. The case is totally severed, and the rule was for severance. And then for convenience, those witnesses were presented in a joint trial.

And if we look at it in that way and the case is totally severed and proceed as though the case was totally severed except for those witnesses which can be utilized jointly, I would not oppose the procedure proposed by the Prosecution. If it's a partial severance, then I must oppose the motion totally.

COURT: Mr. White?

MR. WHITE: Yes, I concur entirely with Mr. Bishop on the matter. It seems to me like the State is trying to gain the best of two worlds and be tied to neither one of them. I like the idea, and I concur with Mr. Bishop. If this is going to be a severance, it has to be a total severance, because I have to operate with the law and the rules of evidence in a severance maybe a little differently than I do in a joint. And because of that reason, if there are going to be two juries, one for Mr. Beam and one for Mr. Scroggins, then it should be a total severance.

Tr., Vol. 1, pp. 8–10.

This appeal, these appeals, involve more than the two defendants. The judicial system itself went on trial when there was not a total severance. But, then too, there should not have been any severance unless the trial court was informed in no uncertain terms that neither defendant would take the stand and that the state would rely only upon the out-of-court hearsay oral statements made to the police detectives by the two co-defendants.

Moreover, in capital cases where the penalty of death is probable, the jury system in Idaho continues to be denigrated by a majority of three who have yet to adequately answer the established documented fact that at the adoption of the Idaho Constitution it was the jury which was the determiner of a convicted defendant's obligation to die or right to live out life imprisonment.

I do not profess to having answered other important issues raised on appeal. To do so would encompass even a more considerable expenditure of time. Suffice to hold, as I do, that the procedure utilized was erroneous, and in violation of the requirements of constitutional due process. This defendant, on this appeal, should have

4. *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983) *cert. den.* —— U.S. ——, 104 S.Ct. 3591, 82 L.Ed.2d 887, *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985).

a second trial free from such error as here occurred, and I so vote. The integrity of the judicial system is too valuable to be sacrificed in order to avoid the cost of a second trial.

## ADDENDUM

Two days after the foregoing was written, and after clearing from my desk eleven volumes of record in the *Scroggins* appeal and six volumes of record in the *Beam* appeal, while in the process of putting away the *Beam* file, kismet prompted me to read again through Beam's briefs to ascertain if anything possibly critical was missed. To my dismay a passage therein had been overlooked. "Because of the procedure established by the trial court, this Court is deprived on this record of reading the obvious antagonism which occurred on cross-examination of Beam by Scroggins' counsel." Appellant's Brief, p. 5. At the time of my initial effort the only record which I reviewed and considered was on Beam's appeal, No. 15453 in this Court. On page 862 of that record I saw only what the reader hereof sees—that which by photocopy process is included herein. For ease of continuity, page 862 and the top of page 863 are reproduced *infra*. It had not occurred to me that, following the off-the-record bench conference; the "certain proceedings" which were had in the absence of jury A was the cross-examination of Beam by Scroggins' counsel. In that I do not believe that I am to be overly faulted. No reason manifests itself why those "certain proceedings" were not stated to be what they in fact were. Until now I had concluded that jury B needed some special guidance or instruction with regard to their board and room arrangements—or perhaps one of the jurors was suffering an ailment. At any rate, alerted by the Beam brief's mention of cross-examination of Beam, on resort again to the *Scroggins* appeal record, it is discovered that there was indeed such cross-examination. Not only that, but Beam, with "his" jury not present, gave additional material and relevant testimony on redirect—which redirect was conducted by the prosecuting attorney, Beam having been called as a state's witness. Page 862 of the *Beam* transcript corresponds with pages 910–11 of the *Scroggins* transcript, as is readily seen when the two are placed side by side:

646

MR. BISHOP: Your Honor, prior to cross examination by Mr. White, I would ask that Jury A be removed. I feel this would be proper in light of the two-jury system.

MR. JONES: May we approach the bench on that, Your Honor?

COURT: Approach the bench.

(Whereupon, an off-the-record bench discussion was had between Court and Counsel.)

COURT: I am going to ask that Panel A step down.

(Whereupon, The Bailiff escorted Jury A out of open court and certain proceedings were had in the absence of Jury A. The noon recess was taken from 11:45 a.m. to 1:30 p.m. Reconvened. Counsel for respective parties, together with the Defendants, present. The following proceedings were had in the absence of both Jury A and Jury B.)

862      BEAM ST. D

COURT: I understand Counsel have something they would like to put on the record before the juries are returned into open court.

MR. JONES: I have a couple of matters regarding evidence I would like to move in at this time, Your Honor. State's Exhibit No. 6, the lighter, I would like to move into evidence at this time.

MR. BISHOP: Your Honor, prior to cross

910      BEAM ST. D

examination by Mr. White, I would ask that Jury A be removed. I feel this would be proper in light of the two-jury system.

MR. JONES: May we approach the bench on that, Your Honor?

COURT: Approach the bench.

(Whereupon, an off-the-record bench discussion was had between Court and Counsel.)

COURT: I am going to ask that Panel A step down.

(Whereupon the Bailiff escorted Jury A out of open court. The following proceedings were had in the presence of Jury B only.)

COURT: Cross examination by Defendant Scroggins?

CROSS EXAMINATION
QUESTIONS BY MR. WHITE:

Q. As I understand it, Mr. Beam, you met Shawn earlier in the evening?

A. Yes.

Q. You had dinner together?

911      ST. BEAM X S

From page 911 in the *Scroggins* transcript the cross-examination of defendant Beam by Scroggins' attorney continued on for 20 pages until the witness was then turned back to the prosecutor for further redirect.[5] But, through all of this, the *Beam* jury was kept out of the court room, although his attorney was present while Beam was so examined. Accordingly, although Beam's jury, together with Scroggins' jury, saw and heard the state's first direct examination of Beam, only Scroggins' jury received the benefit of seeing and hearing cross-examination of Beam by Mr. White, and only Scroggins' jury saw and heard the prosecutor's redirect examination of Beam.

Then, when Scroggins testified, it was only because the trial court reversed its ruling that Beam and his attorney were even in the court room, *ante*, p. 544, but under the court's previously declared absolute control over the proceedings, *ante*, p. 543, sat there like dummies with Beam's attorney having no opportunity to cross-examine. Obviously, from reading the colloquy, *ante*, p. 543, the trial court concluded, in the orchestration of this affair, that "Beam's trial" was over, and that Beam and his attorney should play no part in the "Scroggins trial"—but should remain visi-

**5.** Pertinent excerpts are attached hereto as an appendix.

ble because, as prosecutor Haynes worded it, "the jurors ... are lay people involved in this situation and *are* possibly *going to draw certain conclusions from the absence or present of the Defendants....*"

As I earlier tried to make clear, even to the extent of referring to Justice Shepard's opinion, *this was a joint trial* of two defendants who were *jointly charged in a single information.* There was only *one* criminal action being tried. That it was being tried, however, with two juries, did not convert it into two criminal actions with a separate trial in each. In that respect the prosecutor was not in error. The two defendants were jointly charged with enticing their victim away to a secluded spot, charged with raping her, and charged with murdering her. As the testimony of each given at trial would later establish, there was no doubt whatever but that the victim was raped and was murdered and that one or both were guilty, but to the same or varying degrees.

Where both defendants took the stand, and were therefore available and subject to cross-examination, there was absolutely no basis for application of the *Bruton* rule. The correct reading of that case is that the rule applies only when one defendant's confession is going to be introduced against, and, because he cannot be made to take the stand, the co-defendant who is implicated by that confession is thereby denied his constitutional right of confrontation—the right to cross-examine.

Beam's opening brief, beginning at p. 22, advances this proposition:

The trial court believed that such procedure would solve the problem created by the *Bruton* rule, i.e., both defendants had given incriminating statements and the trial court believed that by using the two juries, each could be protected against the statement given by the other. Perhaps the use of the two juries eased somewhat the *Bruton* concern, but it did not solve the real problem of conflict which existed, i.e., the antagonistic defenses which would appear in a joint trial.

Appellant's Brief, pp. 22–23.

As authority supporting the contention that antagonistic defenses require a complete severance, reliance was placed on American Bar Association Standards Relating to Joinder and Severance, Standards 2 and 3 (1968), and also on two fairly recent cases, *State v. Thibodeaux*, 315 So.2d 769 (La. 1975) and *Jenkins v. State*, 230 A.2d 262 (Del.1967).

Turning first to the *Jenkins* case, the opinion there made no mention of *Bruton*. This is understandable, because *Jenkins* was announced 54 days before *Bruton*. The Delaware court, not having the benefit of *Bruton*, nonetheless delivered an outstanding decision. It first observed, and I borrow this directly from Beam's brief:

"Ordinarily, an *abuse of discretion will not arise from the mere fact that the confession* or admission of a co-defendant, implicating the moving defendant and not admissible against him, *will be introduced at the joint trial.* Some other factor must be present such as: (1) absence of other substantial, competent evidence of the movant's guilt, e.g., *Burton v. State*, supra; (2) *antagonistic defenses as between the co-defendant and the movant*, e.g., *People v. Barbaro*, 395 Ill. 264, 69 N.E.2d 692 (1946); and (3) *difficulty of segregating the evidence as between the co-defendant and the movant*, e.g., *Day v. State*, 196 Md. 384, 76 A.2d 729 (1950)."

Appellant's Brief, p. 24 (emphasis added).

And, then, equally as compelling as Justice Brennan's *Bruton* opinion, *after having noted that neither* of those co-defendants charged with murder had testified at trial, the Delaware court succinctly and pointedly stated:

Insofar as the degree of culpability and credibility was concerned, to try both Jenkins and Warner together was, in effect, to try each upon the extra-judicial statement of the other. Compare *State v. Desroche*, 47 La.Ann. 651, 17 So. 209. This is impermissible under our fundamental concepts of criminal justice, in-

cluding the right of an accused to be confronted by, and to cross examine, his accuser. See *People v. Aranda,* 63 Cal.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265 (1965).

We are aware that the Trial Court repeatedly cautioned the jury that the statement of one co-defendant should not be used against the other. Under the circumstances before us, such cautionary instructions—like attempts to delete a name from a co-defendant's statement—do not correct substantial injustice or make an otherwise unfair trial fair. It is our opinion that admonitions to the jury, under these circumstances, neither eradicate inadmissible evidence from the minds of the jury nor obviate the possibility of the jury being misled by the statement of a co-defendant. Compare *Stallard v. State,* 187 Tenn. 418, 215 S.W.2d 807 (1948); *People v. Sweetin,* 325 Ill. 245, 156 N.E. 354 (1927).

*Jenkins, supra,* 230 A.2d at 273.

Frankly, I do not see *Jenkins* as standing for the principle that mere antagonism between two defendants, or perhaps better worded, the presentation of antagonistic defenses standing alone is an adequate ground for a total severance. Rather I see *Jenkins* as achieving the exact rule of law which *Bruton* would announce 54 days later, both *Bruton* and *Jenkins* relying on *People v. Aranda,* 63 Cal.2d 518, 47 Cal. Rptr. 353, 407 P.2d 265 (1965).

*Thibodeaux,* a post-*Bruton* case, gives it no mention whatever. This is understandable, because there is also no mention of any confession by one defendant who would not testify and subject himself to cross-examination, whereby the other defendant would be prejudiced by a violation of the confrontation clause. As pointed out therein, the Louisiana court simply relied upon the "antagonistic defenses" doctrine which that court itself had developed. 315 So.2d at 770. Even so, that court also observed that *"mere allegations that the co-defendant intends to point an accusatory finger at the defendant is not enough.* Article 704 [Code of Criminal Procedure] requires the defendant seeking a severance to satis-

fy the trial judge by convincing evidence that justice requires a severance." Were Idaho to adopt that strange and ancient doctrine of the Louisiana court, this is not a case where antagonistic defenses, i.e., "the pointing of an accusatory finger," would require a severance in the interests of justice. These two defendants were jointly embarked upon a criminal scheme which was consummated by a murder and disposition of the body in a manner which any ordinary human being would find abhorrent and despicable treatment of a dumb animal. In such circumstances the two defendants should be jointly tried other than where the rule of *Bruton* declares otherwise. Here that rule has no application, but was nevertheless applied. This was error, and it cannot be intelligently said that it was not prejudicial to one of the defendants. There was, of course, in front of "Beam's jury" no cross-examination at all. There was, of course, in front of "Scroggins' jury" only the cross-examination by the prosecutor. Beam, then, was thus allowed to spell out his version of the murder in "his" case before "his" jury *without* the contradiction or conflict which was occasioned by the cross-examination by Scroggins' counsel. Scroggins, then, was thus allowed to spell out his version of the murder in "his" case before "his" jury without the conflict or contradiction which might have been occasioned by cross-examination by Beam's counsel. To the point, neither of the two juries were ever presented with the whole picture—a whole picture which should have been presented to *one* jury who with *all* of the evidence before it could assess what credibility should be given to the differing versions of the two defendants as to what happened at the murder scene. These two defendants were the only witnesses.

Understandably, it could be said that *one* jury very well might have convicted both of them of first degree murder, and the trial judge very well might have sentenced both to death, as was done. But, on the other hand, even reading a cold record, certain impressions are necessarily taken as to the

candidness of Beam's testimony and the candidness of Scroggins' testimony, remembering, however, that neither was subjected to adverse cross-examination by the co-defendant's counsel before either the Beam jury or the Scroggins jury. Such determinations of credibility and weight are solely within the province of a jury— one jury in this case.

Returning to where this Addendum was opened, mention is made that appellate review in this appeal of Beam's is a mess. It has already been mentioned that in attempting to piece together the whole picture of events which transpired below it has been necessary to resort to material outside of the record on this appeal, to wit, the appeal record on Scroggins' appeal. This is not ordinarily acceptable appellate practice, but, on the other hand, this is not the ordinary appeal.[6] The point which I started out to make is that my initial opinion was written only *after* it was found necessary to go to both records, and even on doing that, the conclusion first reached was that Scroggins had not testified. Much later it is discovered that he did. At the time I concluded my initial effort I was deceived into believing that there had been no cross-examination of Beam by Scroggins' counsel. A re-reading of the majority opinion informs me not to the contrary. Any record on appeal which is so insufficient that, even with *sua sponte* appellate augmentation, it finds an appellate judge mistaken and perhaps confused is not an adequate record in any case, and never in a capital case.

I rest my case in asserting that the appellate record is a mess. Given an abundance of time and no other appeals to consume my time, it might be that I would feel comfortable. Presently I do not. I am convinced, however, that the *Bruton* rule had no application, and that in this case it was applied in a manner which did not promote "the search for truth."

6. As mentioned earlier, there is but one information charging both defendants, and there is but one criminal action, C–5527. The appeal of each defendant to this Court properly would

It might be said that the two records are so convincing of the absolute guilt of both defendants, that it was not even necessary to try them once they were charged on the evidence which was adduced. A public figure in law enforcement has recently said something in that vein. As stated earlier, however, the judicial system itself is here on trial, and I would vote to preserve that system by reversing and remanding for a new trial where the right of confrontation is afforded, and one jury hears *all* of the testimony and passes on credibility and weight to be accorded the two main witnesses.

## APPENDIX

A  Yes.

Q  At Sandra Wahlen's?

A  Yes.

Q  Then later that evening you met— you went with Shawn and you met Mondi and this other girl.

A  Yes.

Q  Now, you say Shawn handcuffed himself to the little girl. Which girl was that?

A  Donnette.

Q  When had you given him the handcuffs?

A  Just before we got—five seconds before we got there.

Q  Was there any discussion about the handcuffs?

A  Just a joke. He was just going to joke around with them.

Q  Just joke around with them?

A  Yeah.

Q  Did you know the two girls?

A  I'd seen 'em the night before. I didn't know their names. They told us their names, but I just forgot 'em.

Q  Did you say Shawn was teasing with the girls?

have been a continuation of that action, and properly both appeals would have been heard at the same time.

A   Yes.

Q   With the handcuffs?

A   Yes.

Q   And with his knife?

A   Yes.

Q   Then you got the knife on the way to Miss Lenten's home?

A   Yes.

Q   And you walked about halfway with the handcuffs on the girl?

A   Two blocks from the house.

Q   So you were just walking hand in hand with the handcuffs on?

A   Yes.

Q   Which hand did Shawn have handcuffed to the other girl?

A   His left.

Q   His left?

A   Yes.

Q   He gave you the knife so that you could take them off of him.

A   Yes.

Q   He is right-handed.

A   Yes.

Q   How long were you at the girls'?

A   40 to 45 minutes.

Q   You watched TV and watched her little brother play Pacman?

A   Yes.

Q   Did you play with the knife there at the house?

A   No, I did not.

Q   You say you didn't have the knife?

A   No, I gave that back to Shawn soon as the handcuffs came off her and him.

Q   When you got to Safeway or behind Safeway in the area where you say this took place?

A   Yes.

Q   Was it dark?

A   Yes, it was.

Q   How dark?

A   Dark.

Q   Could you see?

A   Yeah.

Q   How far could you see?

A   About five feet in front of me.

Q   Five feet?

A   About that.

Q   When Shawn was doing what you have expressed to the jury, what were you doing?

A   Standing there.

Q   You weren't trying to help the girl?

A   No, I was not.

Q   Was she doing this willingly and voluntarily?

A   More or less, yes.

Q   And you participated also, is that correct?

A   Yes, I did.

Q   How did Shawn remove the handcuffs from her and put them behind her back?

A   With his knife.

Q   With his knife?

A   Yes.

Q   And you say—how did he do this?

A   He undone one and told her to put her hands behind her back and put the handcuffs behind her back.

Q   Now, apparently you didn't have any marijuana to smoke.

A   No, we did not.  I smoked mine before we got out there, before we left the house.

Q   What house?

A   Sandy's.

Q   Is that why you were still stoned?

A   Yes.

Q   How did he slice her panties off?

A   With his knife.

Q   What position was she laying in when he sliced her panties off?

A   She was laying on her back.

Q   This was after you had sexual intercourse with her?

A   Yes—no, I hadn't had sex with her yet.

Q   So her panties were still on when Shawn had sexual intercourse with her.

A   Yes, then he sliced them—

Q   Were they off of both legs, on both legs?

A   Yes, they was.

Q   How about her jeans?

A   Her jeans was pulled all of the way down and off one leg.

Q   Off of one leg.

A   Yes.

Q   Her panties were still on both legs.

A   Right.

Q   Now, apparently you say Shawn took her to the creek.

A   Yes.

Q   What were you doing while he was taking her to the creek?

A   Walking behind asking what the hell was going on, what was he doing.

Q   You say she slipped and fell in the water?

A   Yes, she did.

Q   And Shawn jumped in the water, too?

A   Yes.

Q   How deep was the water?

A   About waist deep.

Q   And he was right out in it?

A   Yes, he was.

Q   Was the girl fighting?

A   No.

Q   She wasn't fighting at all?

A   No.

Q   What were you doing?

A   What?

Q   What were you doing?

A   I was going down the water.

Q   You went down by the water?

A   Yes, I did.

Q   Was the bottom of the creek muddy?

A   Yes, it was.

Q   Very muddy?   Was it gooey?

A   Yes.

Q   Gooey?

A   Yes.

Q   Could you feel your feet sink down into it?

A   Yes.

Q   How far did you sink down in the soil at the bottom of that creek?

A   I'm not really sure.

Q   Give us a good guess.

A   Maybe a half inch, if even that.

Q   Then apparently you were trying to give her CPR?

A   Yes.

Q   That was after he had held her under the water for awhile.

A   Yes.

Q   About two minutes.

A   Yeah, in that area.

Q   And then you had her back out on the bank?

A   Yes, I did.

Q   Did you pick her up and carry her back up on the bank?

A   No, I just laid her back on the bank. Her feet was still in the water.

Q   Where abouts in Exhibit A did you do that?

A   Right there (indicating).

Q   Right between two trees?

A   Yes.

Q   Were there two trees there?

A   Yes, there were.

Q   Was there any limbs on those trees?

A   Yes.

Q   What kind, how many limbs?

A   I'm not sure, probably three.

Q   Three?

A   Yes.   They went out into the water.

Q   They went out into the water?

A   Yes.

Q   You were between those two trees?

A   Yes.

Q   How wide is that?

A   I'm not sure.

Q   Then apparently Shawn, before you could stop him, just plunged that knife right into her throat, before you could stop him?

A   Yes.

Q   How many times did he do that?

A   Four or five.

Q   Do you recall when you were arrested in Nevada?

A   Yes, I do.

Q   What did you tell them?

A   Huh?

Q   What did you tell them down in Nevada?

A   I don't recall.

Q   Would it help if you could read your statement?

A   Yes, it would.

Q   Have you read the statement?

A   Yes, I've been reading it.

Q   You have been reading it?

A   Yes.

Q   When was the last time you read it?

A   Friday.

Q   Just Friday?

A   Yeah, last week. But I've had a lot of other things on my mind.

Q   Down at the bottom of the page, did you tell the officer he sliced her throat just once?

MR. HAYNES:  What page are you on?

MR. WHITE:  Page 8.

BY MR. WHITE:

Q   Is that what you said?

A   Those was not my words. Those are his words.

Q   The officer said just once. What did you say?

A   Well, he goes, "Just once?" and I go, "Once, one slice." That's what I said.

Q   One slice?

A   But at the time—

Q   At that time you had not heard Dr. Donndelinger testify, had you?

A   Well, no, at that time I was scared. I didn't know what was going on.

Q   But at that time you told the officers he just sliced her throat once.

A   Yes, but I didn't quite remember what went on that night, 'cause I was still in a daze.

MR. WHITE:  Excuse me, Your Honor. I would ask that the witness be responsive to the question.

COURT:  Yes, just be responsive to the question.

THE WITNESS:  Yes.

COURT:  Counsel will give you an opportunity to come back on direct if necessary.

BY MR. WHITE:

Q   How long did you have the knife?

A   Well—

Q   That knife.

A   Approximately five minutes.

Q   Apparently you asked the girl if it was all right, and she said yes?

A   Yes.

Q   When Shawn said, "We are going to kill you," she didn't say anything?

A   She said, "No, please don't. I promise I won't tell nobody. Don't kill me."

Q   Won't tell nobody what?

A   That we had had sex with her, that this had taken place.

Q   Did she say she wouldn't tell no one?

A   Yes, she did.

Q   Did you hear her say that?

A   Yes, I did.

Q   Where was she when she said that?

A   Well, she was walking down to the creek.

Q   She was walking to the creek?

A   Yeah, with Shawn behind her holding her hands very tightly.

Q   Where abouts did she say this?

A Well—

Q On the diagram, show the jury where she was at, approximately.

A Between here and here, somewhere in there (indicating).

Q Down where I believe they have identified some railroad ties?

A Yes.

Q Do you remember those railroad ties?

A Yes, I do.

Q You could see them clearly that night?

A Yes, I could.

Q Did you tell the police, after this was over with, that you both just turned and left?

A Yes, I did.

Q Why is it that you didn't—he didn't give the handcuffs back to you until you got to the Red Steer or the realty?

A I don't know.

Q But you do recall that was where the exchange took place?

A Yes, it is.

Q Could you have given him his knife at that time?

A No, I did not have his knife.

Q You deny having the knife.

A I did not have the knife. I only had it for five minutes, but I did not have it at the time she was killed, at the time her throat was sliced.

Q But you held her under until she quit wiggling.

A She only wiggled once.

Q She only wiggled once.

A Just once after her throat was sliced.

Q You held her under.

A Yes, I did.

Q Until she quit wiggling.

A I stated she only wiggled once.

. . . .

Q You apparently told Wes Short everything that happened that night.

A Yes, we did.

Q Did you tell him that the girl had been killed?

A Yes, we did.

Q Did you tell Mr. Short you had drowned the girl?

A No, I did not.

Q What did you tell him?

A I told him that Shawn held her under a couple of times and that I got him away and started CPR and then he sliced her throat and I pushed her head under at that time and turned away.

Q How did Mr. Short react?

A He didn't believe me.

Q He didn't believe you?

A No, he did not.

Q What did he say?

A He said, "I don't believe ya. I believe Shawn more than I do you."

Q "I believe Shawn more than I believe you"?

A Yes.

Q What prompted that comment from Mr. Short?

A What?

Q What prompted that response from Mr. Short, do you recall?

A What did he say then?

Q Yes.

A He says, "Well," he goes, "I advise you to leave town." I go, "Well, I am leaving town, but I'm going to Nevada looking for a job. And this isn't the reason I'm leaving. I've been planning this for two weeks."

Q You were going to Reno to look for a job?

A That's right, but it'd been planned. My mom, my dad, everybody knew I was leaving town to go look for a job in Nevada.

Q Did it ever occur to you to go to the police and tell what you had done?

A Yes, it did.

Q Why didn't you?

A  Because I made a promise to Shawn that I wouldn't tell anybody, and I don't break promises.

Q  You made a promise to Shawn?

A  That's right.

Q  Did you not threaten him not to tell on you?

A  No, I did not.  He's the one that asked me the question.  He told me, he asked me if I wouldn't tell nobody and he wouldn't tell on me.  And I said, "Okay, I promise you I won't."  And I did not threaten him at all.

Q  Were you still stoned?

A  A little, not much.

Q  How much is a little?

A  I really don't know.

Q  Apparently you had the girl on the bank, trying to give her CPR?

A  Yes.

Q  That's when Shawn plunged the knife into her throat?

A  Yes.

Q  Was she laying on her back?

A  Yes, she was.

Q  How did he slice her throat when she was laying on her back?

A  How did he slice her throat?

Q  Yes.

A  With the knife.

Q  Did he do it right-handed?

A  Yes, he did.

Q  And she was laying on her back?

A  Yes, she was.

Q  How did he do it?

A  Put his hand across her neck and sliced back.

Q  When you went over to Sandy's that evening, you told her what you had done.

A  Not exactly.

Q  You just told her—

A  That somebody'd been killed.

Q  Pardon?

A  Somebody had been killed.

Q  Somebody had been killed?

A  Yes.

Q  When you went to Sandra's, did you have any shoes on?

A  No, I did not.

Q  Were you barefooted?

A  Yes, I was.

MR. WHITE:  Thank you, Mr. Beam.

COURT:  Redirect by the State?

REDIRECT EXAMINATION
QUESTIONS BY MR. JONES:

Q  Mr. Beam, just a couple of things I want to make sure I understand that the jury understands.  Miss Lenten's panties were sliced off while she was facing the ground.  Her stomach would have been faced to the ground, is that right?

A  Yes.

Q  And this was just before Mr. Scroggins was going to have what you referred to as, I believe, screw her in the butt, is that right?

A  They was cut off after he done that, when he got poop on him.

Q  Then he cut the panties off?

A  Yes, he did, off to one side and then slipped them off the other leg and pulled the pants off.

Q  Just so everyone understands, what position was she in at that time?

A  She was on her stomach at that time.

Q  Mr. White asked you a few questions regarding the number of times Miss Lenten was slashed and read you, or went over with you some of your comments with the officers down in Nevada.  You started to respond to that answer.  And as I understand it, Officer Twedt asked you one time and you started to respond.  Were you just agreeing with Officer Twedt and not going into the full details at that point?

A  Yes, I was.

Q  Mr. White discussed those railroad ties.  Could you point to those on the diagram?

A  Okay.

Q  Is that where your lighter was lost, in that area?

A Yes.

Q Did you trip over those ties?

A Yes, I did.

Q Is that another reason you remember those ties being there?

A Yes.

Q Mr. White also asked you about something Mr. Short said, that he believed Shawn more than he believed you. Is that essentially the question that was asked?

A Yes.

Q Now, is that because at that time Shawn was blaming everything on you?

A Yes.

Q Mr. Beam, what is your education level?

A I have been in special ed all of my life. I completed the ninth grade in special ed. I probably would say I have a sixth grade education.

MR. JONES: Thank you.

COURT: Recross examination by Defendant Scroggins?

MR. WHITE: We have no recross examination, Your Honor.

COURT: You may step down, sir. The State may call its next witness.